**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)
Austin P. Van (*pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
jpafiti@pomlaw.com
avan@pomlaw.com

*Co-Lead Counsel for Lead Plaintiffs & the Proposed Class*

— additional counsel on signature page —

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JIAN ZHOU, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>FARADAY FUTURE INTELLIGENT ELECTRIC INC. f/k/a PROPERTY SOLUTIONS ACQUISITION CORP., CARSTEN BREITFELD, ZVI GLASMAN, WALTER J. MCBRIDE, JORDAN VOGEL, AARON FELDMAN, and YUETING JIA,<br>Defendants. | Case No.: 2:21-cv-09914-CAS-JC<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

AMENDED CLASS ACTION COMPLAINT:  Case No. 2:21-cv-09914-CAS-JC

# TABLE OF CONTENTS

Page(s)

I.     INTRODUCTION ........................................................................... 1

II.    JURISDICTION AND VENUE ...................................................... 6

III.   VIOLATIONS OF THE EXCHANGE ACT ................................... 7

    A.    The Exchange Act Parties ................................................... 7

        1.    Lead Plaintiffs ........................................................ 7

        2.    Defendants ............................................................. 8

    B.    Exchange Act Allegations ................................................. 10

        1.    PSAC Incorporated as a SPAC and Merged with FF in 2021 10

        2.    In the Press Release, Proxy Statement, Registration Statement, and Elsewhere, Faraday Misled Investors About the Number of Reservations the Company Had Obtained and Its Progress in Bringing the FF 91 to Market .............................. 15

        3.    Contrary to Its Claims, the Company Never Obtained More Than a Few Hundred Paid Reservations for Its Cars ............ 18

        4.    Contrary to Its Claims, Beginning Production of the FF91 Within Twelve Months of the Business Combination Was Never Achievable ................................................... 19

        5.    Defendants Knew that the Company's Reservation Figures and Progress Were Overstated ................................. 21

        6.    When Investors Learned the Truth about the Company's Reservations and Progress in Developing a Car, FF's Stock Price Dropped Precipitously ................................... 22

    B.    False and Misleading Statements for the Exchange Act Claims ............... 28

        1.    January 28, 2021 ..................................................... 28

        2.    March 19, 2021 ...................................................... 29

        3.    April 5, 2021 ......................................................... 30

        4.    June 24, 2021 ........................................................ 32

i

5.    July 21, 2021 ........................................................... 33

6.    September 19, 2021 ................................................. 34

C.    Undisclosed Adverse Facts ................................................ 34

D.    Loss Causation .................................................................. 35

E.    Additional Scienter Allegations ........................................ 36

1.    Defendants Knew Beginning Wide-Scale Production of the FF 91 Within Twelve Months of the Business Combination Was Never Achievable ........................................................ 36

2.    Defendants Had Access to Weekly and Biweekly Reports Showing Reservation Figures for the FF 91 Throughout the Class Period ............................................................... 37

3.    Faraday's CEO Defendant Jia Is "China's Best Known Securities Fraudster" ......................................................... 37

4.    The Nature of SPACs Motivated Defendants To Take Liberties in Promoting the Company ................................. 38

F.    Additional Reliance Allegations ........................................ 39

G.    Class Action Allegations .................................................... 42

H.    No Safe Harbor ................................................................. 43

I.    Claims Under Sections 10(b) and 20(a) of the Exchange Act ................... 44

1.    COUNT ONE:  FOR VIOLATIONS OF SECTION 10(B) OF THE SECURITIES EXCHANGE ACT OF 1934 AND SEC RULE 10B–5 (AGAINST FARADAY, THE FARADAY INDIVIDUAL DEFENDANTS, AND THE PSAC DEFENDANTS) ................................................................ 44

2.    COUNT TWO:  FOR VIOLATIONS OF SECTION 20(A) OF THE SECURITIES EXCHANGE ACT OF 1934 (AGAINST THE FARADAY INDIVIDUAL DEFENDANTS AND THE PSAC DEFENDANTS) ................................................................ 47

J.    Claims Under Sections 14(a) and 20(a) of the Exchange Act ................... 48

3.     COUNT THREE:  FOR VIOLATIONS OF SECTION 14(A) OF THE SECURITIES EXCHANGE ACT OF 1934 AND SEC RULE 14A–9 (FARADAY, THE FARADAY INDIVIDUAL DEFENDANTS, AND THE PSAC DEFENDANTS) ................................................................ 51

4.     COUNT FOUR:  FOR VIOLATIONS OF SECTION 20(A) OF THE EXCHANGE ACT IN CONNECTION WITH THE PROXY CLAIMS (AGAINST THE FARADAY INDIVIDUAL DEFENDANTS AND THE PSAC DEFENDANTS) ................................................................ 53

IV.   VIOLATIONS OF THE SECURITIES ACT ........................................ 55

    A.    The Securities Act Plaintiffs ........................................................ 55

        1.    Plaintiffs ................................................................. 55

        2.    Defendants ............................................................. 56

    B.    The Securities Act Allegations .................................................... 59

        1.    PSAC Incorporated as a SPAC and Merged with FF in 2021 ... 59

        2.    Faraday Misled Investors About the Number of Reservations the Company Had Obtained and Its Progress in Bringing the FF 91 to Market ......................... 63

        3.    Contrary to Its Claims, the Company Never Obtained More Than a Few Hundred Paid Reservations for Its Cars ............ 65

        4.    Contrary to Its Claims, Beginning Production of the FF91 Within Twelve Months of the Business Combination Was Never Achievable ...................... 66

        5.    When Investors Learned the Truth about the Company's Reservations and Progress in Developing a Car, FF's Stock Price Dropped Precipitously ................ 68

    C.    False and Misleading Statements for the Securities Act Claims ............... 74

    D.    Undisclosed Adverse Facts ........................................................ 76

    E.    Securities Act Counts ............................................................... 77

1.      COUNT FIVE:  FOR VIOLATIONS OF SECTION 11 OF THE SECURITIES ACT OF 1933 (AGAINST ALL DEFENDANTS)................................................................77

2.      COUNT SIX:  FOR VIOLATIONS OF SECTION 15 OF THE SECURITIES ACT OF 1933 (AGAINST THE FARADAY INDIVIDUAL DEFENDANTS, THE SECURITIES ACT DEFENDANTS, AND THE PSAC DEFENDANTS)................................................................78

V.    PRAYER FOR RELIEF ........................................................................79

VI.   JURY TRIAL DEMANDED.................................................................79

Lead Plaintiffs Byambadorj Nomin, Hao Guojun, Peihao Wang, and Shentao Ye (collectively, the "Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' Amended Class Action Complaint against Defendants, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys. This investigation included, among other things, (1) a review of the Defendants' public documents, conference calls and announcements made by Defendants; (2) United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Faraday Future Intelligent Electric Inc. ("Faraday," "FF," or the "Company") f/k/a Property Solutions Acquisition Corp. ("PSAC"); (3) communications with former employees; (4) analysts' reports and advisories about the Company; and (5) information readily obtainable on the Internet. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    INTRODUCTION

1.     This is a federal class action brought individually and on behalf of all persons and entities other than Defendants that:  (a) purchased or otherwise acquired Faraday securities between January 28, 2021 and April 14, 2022, both dates inclusive (the "Class Period") and/or (b) beneficially owned and/or held PSAC Class A common stock as of June 21, 2021 and were eligible to vote at PSAC's July 20, 2021 special meeting (collectively, the "Class").  Plaintiffs bring this action to recover damages caused by Defendants' violations of the federal securities laws, including Sections 10(b), 14(a), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act").

2.     Faraday is an early-stage company headquartered in California that aims to design and manufacture electric vehicles in the United States and internationally.  Faraday was formed in 2021 through the merger of PSAC Merger Sub, Ltd., an exempted company

with limited liability incorporated under the laws of the Cayman Islands and wholly-owned subsidiary of PSAC, and FF Intelligent Mobility Global Holdings Ltd., an exempted company with limited liability incorporated under the laws of the Cayman Islands ("Legacy FF"). Legacy FF was a private startup electric vehicle company founded in 2014 by Defendant Jia, known as "China's best known securities fraudster," and PSAC was a special purpose acquisition company or "SPAC" formed for the purpose of effecting a business combination with another business usually for the purposes of bringing the target public without going through the initial public offering process. On January 28, 2021, PSAC and Legacy Faraday announced their plan to merge, and on July 21, 2021, these entities completed their merger into Faraday (the "Business Combination"), which began publicly trading on the NASDAQ.

3.     Throughout the Class Period, beginning with its announcement of the Business Combination, Faraday misrepresented two critical facts about its business: (1) the number of reservations it had received for its flagship vehicle, and (2) the Company's ability to begin producing its flagship vehicle within twelve months of the Business Combination. The SEC is currently investigating Faraday in connection with these obvious securities law violations.

4.     *First*, Faraday wildly misrepresented the level of committed reservations it had for its flagship car by repeatedly telling investors that "***its first flagship model, the FF 91, ha[d] received over 14,000 reservations***."[1] In fact, the Company had obtained only several hundred paid reservations for the FF 91 at the time of these misstatements. This exaggeration was enormous in magnitude and highly material to investors: under reasonable assumptions using the Company's claimed selling price for the FF 91 of approximately $200,000, the Company repeatedly claimed in effect that it would achieve revenue of $2.52 billion soon after producing its first vehicle, which overstates by orders of magnitude the approximately $54 million in revenue the Company would have achieved from the few hundred paid reservations it actually held. In February 2022,

---

[1] All emphasis in this Complaint is added unless otherwise indicated.

following an internal investigation using outside auditors, the Company admitted in a current report on Form 8-K that:

> The Company's statements leading up to the Business Combination that it had received more than 14,000 reservations for the FF 91 vehicle were potentially misleading because only several hundred of those reservations were paid, while the others (totaling 14,000) were unpaid indications of interest.

5.    That is, Faraday has effectively admitted to the core of the securities law violations under Section 14(a) of the Exchange Act and Sections 11 and 15 of the Securities Act pleaded in this Complaint.

6.    Faraday's overstatements of its reservations also violated Section 10(b) and 20(a) of the Exchange Act.  Multiple confidential witnesses have confirmed that the Company's reservations figures were routinely discussed at Company-wide meetings at which Individual Defendants were present, and were emphasized at these meetings as the key metric by which to measure the Company's progress and likelihood of success.  These Individual Defendants, and through them Faraday, knew, or were severely reckless in not knowing, that the reservation figures disclosed to the public were wildly off, and at minimum, materially misleading.

7.    *Second*, Faraday also repeatedly misled investors about its ability to bring the FF 91 to market within twelve months of the Business Combination.  For example, in soliciting votes in support of the Business Combination, Defendants boasted, "FF . . . is positioned to launch a production try-out in 9 months and commercial production of FF 91 series within 12 months after the Business Combination."

8.    While the federal securities laws permit a Company to be optimistic about its future, they do not permit a Company to mislead investors about goals known to be impossible to achieve.  Here, multiple confidential witnesses have confirmed that at no point during the Class Period was Faraday even close to being in a position in its design and manufacturing of the FF 91 to claim that it could bring that model to market within one year of the Business Combination.  That achievement was impossible, and the Company knew as much.  Accordingly, Faraday's statements that it could bring the FF

91 to market within one year of the Business Combination violated Section 10(b) and 14(a) of the Exchange Act, and Section 11 of the Securities Act.

9.     The truth began to emerge on October 7, 2021, when J Capital Research published a report (the "J Capital Report") explaining that Faraday's claimed 14,000 deposits were likely fabricated because 78% of those reservations were made by a single undisclosed company that was likely an affiliate.[2]   The report further explained that contrary to representations of progress toward manufacturing made by Faraday, former engineering executives did not believe that the car was close to being ready for production.

10.     On this news, the Company's share price fell $0.35 per share, or more than 4%, to close at $8.05 per share on October 8, 2021.

11.     The truth fully emerged on November 15, 2021, when Faraday disclosed that its board of directors "formed a special committee of independent directors to review allegations of inaccurate disclosures," (the "Special Committee") including the claims in the J Capital Report.  The Company would later admit that the Special Committee found that the Company's statements leading up to the Business Combination that it had received more than 14,000 reservations for the FF 91 vehicle "were potentially misleading because only several hundred of those reservations were paid, while the others (totaling 14,000) were unpaid indications of interest."  Among other things, the Special Committee also identified "certain inconsistencies in statements to investors and certain weaknesses in its corporate controls and culture, as detailed in the Form 8-K."

12.     On this news, the Company's share price fell $0.28 per share, or approximately 3%, to close at $8.83 per share on November 16, 2021.

13.     On March 31, 2022, Faraday announced that it was unable to file its Annual Report on Form 10-K for the year ended December 31, 2021 (the "Form 10-K") within the prescribed time period, and did not expect to file it by the extended filing date pursuant to SEC Rule 12b-25, as a result of delays related to internal investigation work and

---

[2] A copy of the J Capital Report is annexed hereto as Exhibit A.

remediation efforts.  Faraday also revealed that the SEC had commenced an investigation into the disclosure issues facing the Company:

> Subsequent to the February 1 Form 8-K, the Company, certain members of the management team and employees of the Company received a notice of preservation and subpoena from the staff of the SEC stating that the SEC had commenced a formal investigation relating to the matters that were the subject of the Special Committee investigation.  The Company, which had previously voluntarily contacted the SEC in connection with the Special Committee investigation, is cooperating fully with the SEC's investigation.

14.     On this news, the Company's share price fell $0.17 per share, or more than 3%, to close at $4.99 per share on March 31, 2022.

15.     On April 7, 2022, Faraday announced that it received a letter from the Listing Qualification Department of the NASDAQ indicating that the Company was out of compliance with NASDAQ Listing Rule 5250(c)(1) for continued listing, resulting in delisting of the Company's securities.

16.     On this news, the Company's share price fell $0.05 per share, or more than 1%, to close at $4.19 per share on April 7, 2022.

17.     On April 14, 2022, Faraday announced that "additional investigative and remedial work in connection with the independent investigation has now been completed and on April 12, 2022, the Board approved certain additional remedial actions, effective immediately."   In particular, the Company announced that Defendant Jia would be removed as an executive officer of the Company, along with other disciplinary actions and terminations of employment with respect to other Company employees.   The foregoing remedial actions were taken for multiple reasons including but not limited to such persons' (1) failure to fully disclose to the Company their relationships with certain related parties and affiliated entities in connection with the Company's July 2021 business combination with PSAC; (2) failure to fully disclose similar, potentially relevant information to individuals involved in the preparation of the Company's periodic SEC filings; and (3) lack of cooperation and withholding of potentially relevant information in connection with the Special Committee investigation.

18.     On this news, the Company's share price fell $0.12 per share, or more than 2%, to close at $4.50 per share on April 14, 2022.

19.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## II.     JURISDICTION AND VENUE

20.     Certain claims asserted herein arise under Sections 10(b), 14(a), and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

21.     Additional claims asserted herein arise under Section 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o).

22.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa).

23.     This Court also has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 22 of the Securities Act (15 U.S.C. § 77v).

24.     Venue lies in the Central District of California pursuant to Section 27 of the '34 Act, 15 U.S.C. § 78aa, because Defendants transact business in this District and because the Company's principal place of business is and at all relevant times was located at 18455 South Figueroa Street, Gardena, California 90248, which is situated within this District.   Venue is also proper in this District pursuant to 28 U.S.C. §§ 1391(b)–(d) because many of the acts and transactions that constitute the violations of law complained of in this Amended Complaint, including the dissemination to the public of materially false or misleading statements, occurred or emanated from within this District.

25.     In connection with the acts, omissions, conduct, and other wrongs alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails, the facilities of the national securities markets, and interstate telephonic and digital communications systems.

### III.    VIOLATIONS OF THE EXCHANGE ACT

**A.    The Exchange Act Parties**

    **1.    Lead Plaintiffs**

        **i.    Lead Plaintiff Byambadorj Nomin**

26.    Byambadorj Nomin, as set forth in a previously filed Certification (ECF No. 15-1), acquired Faraday securities at artificially inflated prices during the Class Period and suffered damages when corrective disclosures revealed Defendants' violations of the federal securities laws, as alleged herein.

        **ii.    Lead Plaintiff Hao Guojun**

27.    Lead Plaintiff Hao Guojun, as set forth in a previously filed Certification (ECF No. 15-1), acquired Faraday securities at artificially inflated prices during the Class Period and suffered damages when corrective disclosures revealed Defendants' violations of the federal securities laws, as alleged herein.

        **iii.    Lead Plaintiff Peihao Wang**

28.    Lead Plaintiff Peihao Wang, as set forth in a previously filed Certification (ECF No. 28-3), acquired Faraday securities at artificially inflated prices during the Class Period and suffered damages when corrective disclosures revealed Defendants' violations of the federal securities laws, as alleged herein.

        **iv.    Lead Plaintiff Shentao Ye**

29.    Lead Plaintiff Shentao Ye, as set forth in a previously filed Certification (ECF No. 28-3), acquired Faraday securities at artificially inflated prices during the Class Period and suffered damages when corrective disclosures revealed Defendants' violations of the federal securities laws, as alleged herein.

        **v.    Additional Plaintiff Joshua Maa**

30.    Additional Plaintiff Joshua Maa, as set forth in a previously filed Certification (ECF No. 18-2), acquired Faraday securities at artificially inflated prices during the Class Period and suffered damages when corrective disclosures revealed Defendants' violations of the federal securities laws, as alleged herein.

### vi.     The Plaintiff Class

31.     The proposed Class includes the above-named Plaintiffs and all persons and entities other than Defendants that:   (a) purchased or otherwise acquired Faraday securities during the Class Period and/or (b) beneficially owned and/or held PSAC Class A common stock as of June 21, 2021 and were eligible to vote at PSAC's July 20, 2021 special meeting.

### 2.     Defendants

### i.     Faraday Future Intelligent Electric Inc.

32.     Defendant Faraday is organized under the laws of Delaware, with principal executive offices located at 18455 S. Figueroa Street, Gardena, California 90248.  Shares of the Company's Class A common stock trade in an efficient market on the NASDAQ under the symbol "FFIE."  Its redeemable warrants trade on the NASDAQ under the symbol "FFIEW."  Each whole redeemable warrant is exercisable for one share of Class A common stock at an exercise price of $11.50 per share.   Prior to the Business Combination, PSAC's common stock traded on the NASDAQ exchange under the symbol "PSAC," and its redeemable warrants, exercisable for shares of common stock at an exercise price of $11.50 per share, traded under the symbol "PSACW."

### ii.     The Faraday Individual Defendants

33.     Defendant Carsten Breitfeld ("Breitfeld") was the Chief Executive Officer ("CEO") of Legacy FF prior to the Business Combination, and the CEO of Faraday after the Business Combination.

34.     Defendant Zvi Glasman ("Glasman") was the Chief Financial Officer ("CFO") of Legacy FF prior to the Business Combination, and the CFO of Faraday after the Business Combination until October 27, 2021.

35.     Defendant Walter J. McBride ("McBride") was the CFO of Faraday from November 1, 2021 through the end of the Class Period.

36.     Defendant Yueting Jia ("Jia") is the Founder of Legacy FF.  He served as Chief Product and User Ecosystem Officer of Legacy FF and retained the position after the closing of the Business Combination.

AMENDED CLASS ACTION COMPLAINT: CASE NO. 2:21-CV-09914-CAS-JC

37.    All references to the "Faraday Individual Defendants" in this Amended Complaint refer to Faraday, Breitfeld, Glasman, McBride, and Jia.

### iii.    The PSAC Defendants

38.    Defendant Vogel was the Co-CEO of PSAC from its inception until the Business Combination.

39.    Defendant Feldman was the Co-CEO and Treasurer of PSAC from its inception until the Business Combination.

40.    All references to the "PSAC Defendants" in this Amended Complaint refer to Vogel and Feldman.

41.    The Court has personal jurisdiction over the Faraday Individual Defendants and the PSAC Defendants because the Faraday Individual Defendants and the PSAC Defendants conducted substantial business in this District, and the events giving rise to Plaintiffs' claims arise out of and relate to the Faraday Individual Defendants' and the PSAC Defendants' contacts with this District.  The Faraday Individual Defendants' and PSAC Defendants' actions are controlled by the Company.  The Faraday Individual Defendants' and PSAC Defendants' affiliations with this District are so continuous and systematic as to render them essentially at home in California.  Further, the Faraday Individual Defendants and PSAC Defendants have transacted business, maintained substantial contacts, purposefully targeted investors, and committed other overt acts in furtherance of the unlawful acts alleged herein in this District, as well as throughout the United States.  The unlawful acts of the Faraday Individual Defendants and PSAC Defendants have been directed at, have targeted, and have had the effect of causing injury to investors who are citizens or nationals of the United States, and to investors who reside in, are located in, or are doing business in this District, as well as throughout the United States.

42.    The Faraday Individual Defendants and PSAC Defendants possessed the power and authority to control the contents of the Company's SEC filings, press releases, and other market communications.  The Faraday Individual Defendants and the PSAC

Defendants were provided with copies of the Company's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with the Company, and their access to material information available to them but not to the public, the Faraday Individual Defendants and PSAC Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Faraday Individual Defendants and the PSAC Defendants are liable for the false statements and omissions pleaded herein.

43. The Faraday Individual Defendants and the PSAC Defendants are collectively referred to herein this Section as "the Individual Defendants."

44. The Company, the Faraday Individual Defendants, the PSAC Defendants are collectively referred to herein as " Defendants."

## B. Exchange Act Allegations

### 1. PSAC Incorporated as a SPAC and Merged with FF in 2021

#### . Formation and Purpose of the SPAC

45. PSAC was a SPAC formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization, or similar business combination with one or more businesses.

46. In July 2020, PSAC completed its initial public offering in which it sold an aggregate of 22,977,568 units at a price of $10.00 per unit, generating gross proceeds of $229,775,680. Each unit was redeemable for $10.00 per share. Simultaneously with the completion of the initial public offering, PSAC completed the private placement of 594,551 private units at a price of $10.00 per private unit, generating total proceeds of $5,945,513, to the Company's initial stockholders and EarlyBirdCapital, the sole book-running manager of the initial public offering. A total of $229,775,680 from the net proceeds of the sale of the units in the initial public offering and the sale of the private units was placed in a trust account located in the United States.

10
AMENDED CLASS ACTION COMPLAINT: CASE NO. 2:21-CV-09914-CAS-JC

47.  On July 2, 2020, in its registration statement filed with the SEC on Form S-1, PSAC represented that "We may pursue a business combination opportunity in any business or industry we choose although we currently intend to focus on target companies that service the real estate industry."

48.  In recent years, SPACs like PSAC have become magnets for fraud, which has caused great concern among U.S. regulators and investors.  The SEC has criticized SPACs because of their apparent tendency to encourage fraud.

49.  As John Coates, Acting Director, Division of Corporate Finance at the SEC has stated:

> Some . . . practitioners and commentators have claimed that an advantage of SPACs over traditional IPOs is lesser securities law liability exposure for targets and the public company itself.  They sometimes specifically point to the Private Securities Litigation Reform Act (PSLRA) safe harbor for forward-looking statements, and suggest or assert that the safe harbor applies in the context of de-SPAC transactions but not in conventional IPOs.  This, such observers assert, is the reason that sponsors, targets, and others involved in a []SPAC feel comfortable presenting projections and other valuation material of a kind that is not commonly found in conventional IPO prospectuses.[3]

50.  The possibility of lower risk for securities law liability for company misstatements naturally entices such SPACs to take liberties that other publicly traded companies would not in their disclosures, and so encourages SPACs to mislead the investing public.

51.  In the view of the SEC, any claim that the securities laws do not adequately cover SPACs "is overstated at best, and potentially seriously misleading at worst."

52.  SPACs also create perverse incentives for their key employees.  Because key employees of SPACs will lose their employment at the end of the life of the SPAC, they have an incentive to find a suitable target for acquisition without fail in order to obtain employment at the acquired company.  They also have incentives to choose one target

---

[3] John Coates, *SPACs, IPOs and Liability Risk under the Securities Laws*, U.S. Sec. & Exch. Comm'n (Apr. 8, 2021), https://www.sec.gov/news/public-statement/spacs-ipos-liability-risk-under-securities-laws?utm_medium=email&utm_source=govdelivery.

over another based on the differing compensation they may receive through becoming an employee at different targets.  These incentives may cause key employees to overlook problems at a target company they favor, or to present a target company in misleadingly favorable light to ensure the company is acquired.

### a.    Faraday's Company History

53.    Faraday was founded in May 2014 by Chinese businessman, Defendant Jia Yueting.  The Company is headquartered in Los Angeles where it has an R&D Center and Futurist Testing Lab.  The Company also has offices in Silicon Valley, Beijing, Shanghai, and Chengdu.

54.    Faraday's primary business appears to be the design and manufacturing of electric vehicles.  According to its website, Faraday "is a California-based global shared intelligent mobility ecosystem."  Faraday claims, "FF is poised to break the boundaries between the Internet, IT, creative, and auto industries with product and service offerings that integrate new energy, AI, Internet, and sharing models.  FF's vision is to create a shared intelligent mobility ecosystem that empowers everyone to move, connect, breathe and live freely."

55.    In 2015, the Company announced that it would build a plant in North Las Vegas, Nevada.

56.    In 2017, Faraday revealed a mockup of its primary product focus, the FF 91 crossover vehicle, at the Consumer Electronics Show.  Faraday claimed at the time that production would begin in 2018.

57.    By the time the FF 91 was unveiled in 2017, Faraday had festering financial troubles.  Reports surfaced of Faraday's accumulating debts, lawsuits from suppliers, and claims from former employees that Faraday was actually two companies, with a separate entity set up in the Cayman Islands that owns Faraday's intellectual property.  Founder Jia had also established another competing electric vehicle venture, the LeEco LeSee,

which insiders alleged was pulling funds and talent away from Faraday, despite other sources claiming that the LeSee was never a real car (the LeSee has never been produced).

58.   In July 2017, a Chinese court froze $182 million in assets belonging to Defendant Jia, his wife, and LeEco affiliates. Days later, Faraday Future announced that its North Las Vegas factory plans had been scrapped. In August 2017, Faraday signed a lease for a former Pirelli tire plant in Hanford, California, and a year later Faraday sold a 45 percent stake to Evergrande Group—a Chinese property developer incorporated in the Cayman Islands—for $854 million. However, two months later Evergrande pulled out of the deal, and Faraday began to make massive layoffs and salary cuts.

59.   In 2019, Defendant Jia filed for personal bankruptcy with over $3 billion in debt and stepped down from his role as CEO.

60.   Throughout this period, Faraday continued to promise the imminent arrival of the FF 91. In 2017, upon revealing the FF 91, the Company state that it would begin production of the car in 2018. In 2018, the Company said it had built a pre-production prototype at the Hanford plant and said production would begin in 2019. As explained further below, to date, Faraday has not produced a single vehicle for commercial sale, and repeatedly misrepresented its progress to investors during the Class Period.

### b.   Faraday's FF 91 Electric Vehicle

61.   The primary specifications of the FF 91 have remained unchanged since the prototype was first revealed in 2017. Three electric motors—two at the rear and one up front—supply a stated 1050 horsepower to all four wheels. Faraday claims an acceleration rate of zero-to-60-mph in under 2.4 seconds for the crossover, which measures 206.9 inches long. The FF 91 relies on a 130.0-kWh battery pack, which Faraday says will provide a 378-mile range on the EPA test cycle.

62.   According to a Faraday spokesperson, the most updated prototype of the FF 91 vehicle features a new instrument panel, front and rear consoles, and production-intent

exterior lighting. It also features new exterior badging, a new production-spec lidar assembly mounted on the roof, and production paint.

63. Faraday has suggested that the FF 91 will have a six-figure price and will compete with the Tesla Model X and Lucid Motors' Air. Faraday claims that the top-of-the-line FF 91 Futurist Alliance model will cost more than $200,000, will be limited to 300 units, and will aim to compete with Bentley, Rolls-Royce, and Maybach.

64. The Company claims that its Hanford plant will start production of the FF 91 with an annual volume of 10,000 units, and that the plant has room to expand to 30,000 vehicles per year.

### c. Merger of PSAC and FF

65. On January 27, 2021, PSAC, PSAC Merger Sub, Ltd. (an exempted company with limited liability incorporated under the laws of the Cayman Islands and wholly-owned subsidiary of PSAC) and Legacy FF entered into an Agreement and Plan of Merger ("Merger Agreement").

66. On January 28, 2021, PSAC and Legacy FF issued a press release announcing the Merger Agreement. The press release, titled "Faraday Future to List on NASDAQ Through Merger With Property Solutions Acquisition Corp. With Estimated $1 Billion in Proceeds," stated that PSAC and Legacy FF had entered into a definitive agreement for a business combination, and that following the closing, the combined company would be listed on the NASDAQ.

67. The transaction reportedly would provide an estimated $1.0 billion of gross proceeds to Faraday. This amount included $230 million in cash held by PSAC in trust (assuming no redemptions) and $775 million from the sale of common stock through a so-called "private investment in public equity" or "PIPE."

68. To effect this PIPE, PSAC entered into agreements with certain accredited investors or qualified institutional buyers ("Subscription Investors"). In these agreements, the Subscription Investors agreed to purchase an aggregate of 79,500,000

shares of common stock of PSAC for a purchase price of $10.00 per share, or an aggregate of approximately $795 million.

69.     On July 21, 2021, the Company completed the merger (the "Business Combination").  On that day, Faraday announced the closing in a press release that noted that "[u]pon the consummation of the Business Combination, the registrant changed its name from "Property Solutions Acquisition Corp." to "Faraday Future Intelligent Electric Inc.""

70.     As of July 21, 2021, each outstanding FF share (or indicative FF share, with respect to such outstanding FF converting debt and such other outstanding liabilities of FF) converted into a number of shares of new Class A common stock of the Company following the Business Combination equal to an exchange ratio of 0.14130.

**2.     In the Press Release, Proxy Statement, Registration Statement, and Elsewhere, Faraday Misled Investors About the Number of Reservations the Company Had Obtained and Its Progress in Bringing the FF 91 to Market**

71.     Beginning at least as early as the Company's first announcement of its intentions to merge PSAC and Legacy FF, and continuing throughout the Class Period, the Company and Defendants repeatedly misrepresented to investors that it had received 14,000 reservations for the FF 91.  As explained in the following section, the Company in fact had received only a few hundred paid reservations while remaining "reservations" were merely unpaid indications of interest, as the Company expressly admitted in its January 26, 2022 press release.

72.     Accordingly, Faraday wildly misrepresented the level of committed reservations it had for its flagship car by repeatedly telling investors that "***its first flagship model, the FF 91, ha[d] received over 14,000 reservations***." The difference between 14,000 paid reservations and a few hundred paid reservations is massive, and this difference was highly material to investors in the Company.  Even assuming a discount of 10% of the Company's claimed selling price for the FF 91 of approximately $200,000, the Company repeatedly claimed in effect that it would achieve revenue of $2.520 billion soon after producing its first vehicle (i.e., $180,000 x 14,000 = $2.520 billion).  This

15

AMENDED CLASS ACTION COMPLAINT: CASE NO. 2:21-CV-09914-CAS-JC

amount vastly overstates the approximately $54 million in revenue the Company would have achieved from the few hundred paid reservations it actually held (i.e., $180,000 x 300 = $54 million).

73. Similarly, before and throughout the Class Period, Defendants repeatedly misrepresented to investors that they expected to begin producing the FF 91 vehicle within twelve months of the Business Combination. As explained in the following section, statements from multiple confidential witnesses make clear that no one at the Company could have reasonably believed that mass production of the FF 91 within that time frame was possible.

74. Defendants made the first of these Statements in the Class Period in their January 28, 2021 press release, which stated, in relevant part:

> This transaction validates FF's vision to create a mobility ecosystem built upon innovations in technology and products. FF's flagship product offering will be the FF 91, featuring industry leading 1,050 HP, 0-60 mph in less than 2.4 seconds, zero gravity seats with the largest 60-degree reclining angles and a revolutionary user experience designed to create a mobile, connected, and luxurious third Internet living space. **_FF 91 is targeted to launch within twelve months after closing of the merger._**
>
> [. . .]
>
> As the world's only tech-luxury intelligent Internet electric vehicle brand, FF expects to sell more than 400,000 units cumulatively over the next five years, **_and its first flagship model, the FF 91, has received over 14,000 reservations_**.

75. Similarly, on March 19, 2021, the Company published the text of a Q&A session with IPO Edge. In that text, the Company stated, in relevant part:

> FF has the most exciting growth opportunity ahead in the EV market. The transaction is expected to fully fund the production of our flagship halo vehicle, the luxury electric FF 91, within 12 months of close. The FF 91 is scheduled to launch in 2022, making our market disrupting product a relatively near-term reality. Our technology has been tested by the world's leading experts, who believe we have an edge that can transform the market with unparalleled performance. FF is led by a world-class management team with deep automotive, software, and internet experience.
>
> **_We have existing demand for the FF 91 by way of more than 14,000 reservations_**, and a strong strategy to scale in the US and China. The strong signal we are seeing from China significantly expands the opportunity ahead for FF, evidenced by the fact that we have a Tier 1 city and a top three Chinese OEM participating in the PIPE financing. These strategic partners

16

AMENDED CLASS ACTION COMPLAINT: CASE NO. 2:21-CV-09914-CAS-JC

will help establish FF's presence in the Chinese market, further solidifying FF's unique US-China dual home market strategy.

76. On April 5, 2021, PSAC filed its Registration Statement and preliminary proxy statement on Form S-4 in connection with the merger. The Registration Statement was signed by Jordan Vogel, Aaron Feldman, David Amsterdam, Avi Savar and Eduardo Abush. In the Registration Statement, the Company stated:

> ***FF intends to commercially launch FF 91 series within twelve months after closing of the Business Combination.*** Toward that goal, FF has completed most of the vehicle development milestones, including 29 prototype and 13 pre-production assets. FF 91 series is designed to compete with Maybach, Bentley Bentayga, Lamborghini Urus, Ferrari Purosangue, Mercedes S-Class, Porsche Taycan, BMW 7-Series etc.
>
> [. . .]
>
> FF has achieved major commercial milestones to bring its FF 91 model to the market. Unlike many competitors, FF has the advantage of speed to market as ***it is positioned to launch a production try-out in 9 months and commercial production of FF 91 series within 12 months after the Business Combination.*** FF has completed 29 prototypes and 13 pre-production assets and has completed most of the vehicle development hurdles including feasibility, concept and development phases. As of the date hereof, 94% of the key components for FF 91 have been sourced, 91% production tooling is complete and 75% of production equipment is complete.

77. The Registration Statement and Proxy Statement incorporated the January 28, 2021 press release with the following language:

> The Merger Agreement was signed on January 27, 2021. Prior to market open January 28, 2021, PSAC and FF jointly issued a press release announcing the signing of the Merger Agreement, and PSAC filed a Current Report on Form 8-K announcing the execution of the Merger Agreement and discussing the key terms of the Merger Agreement in detail.

78. Accordingly, the Registration Statement and Proxy Statement included the statement: "*[FF's] first flagship model, the FF 91, has received over 14,000 reservations* . . . ."

79. On June 21, 2021 and June 23, 2021, PSAC filed Amendments Number 2 and 3, respectively, to its Form S-4 Registration Statement, along with updated preliminary proxy statements. The amended Registration Statements were signed by Jordan Vogel, Aaron Feldman, David Amsterdam, Avi Savar and Eduardo Abush.

80.     On June 24, 2021, PSAC filed its Prospectus on Form 424(b)(3), soliciting stockholder approval of the merger with Legacy FF.

81.     On June 24, 2021, PSAC announced that the SEC had declared effective its Registration Statement on Form S-4.  PSAC also announced that a special meeting of PSAC stockholders would be held on July 20, 2021 at 11:00 a.m. Eastern Time (the "Special Meeting") to approve, among other things, the proposed business combination. The Prospectus and Registration Statement stated, in relevant part:

> FF has achieved major commercial milestones to bring its FF 91 model to the market.  Unlike many competitors, ***FF has the advantage of speed to market as it is positioned to launch a production try-out in 9 months and commercial production of FF 91 series within 12 months after the Business Combination***.

82.     The Prospectus, like the Registration Statement, explicitly incorporated by reference the January 28, 2021 press release:

> The Merger Agreement was signed on January 27, 2021.  Prior to market open January 28, 2021, PSAC and FF jointly issued a press release announcing the signing of the Merger Agreement, and PSAC filed a Current Report on Form 8-K announcing the execution of the Merger Agreement and discussing the key terms of the Merger Agreement in detail.

83.     Accordingly, the Registration Statement and Proxy Statement likewise included the statement:  "***[FF's] first flagship model, the FF 91, has received over 14,000 reservations*** . . . ."

84.     These and Defendants' numerous additional false and misleading statements and omissions are catalogued in their entirety in Part VI below.

### 3.     Contrary to Its Claims, the Company Never Obtained More Than a Few Hundred Paid Reservations for Its Cars

85.     Faraday's and Defendants' repeated misrepresentations that the Company had received over 14,000 reservations for the FF 91 were false and misleading.  In its January 26, 2022 Form 8-K current report, the Company conceded, not only that the Company and Defendants had misrepresented that Faraday had received over 14,000 reservations when it had in fact received only several hundred paid reservations, but also that this misrepresentation was "potentially misleading":

The Company's statements leading up to the Business Combination that it had received more than 14,000 reservations for the FF 91 vehicle were potentially misleading because only several hundred of those reservations were paid, while the others (totaling 14,000) were unpaid indications of interest.

### 4. Contrary to Its Claims, Beginning Production of the FF91 Within Twelve Months of the Business Combination Was Never Achievable

86. Defendant's repeated misrepresentations that Faraday was able to begin producing the FF 91 within twelve months of the Business Combination were also false and misleading. Multiple confidential witnesses have confirmed that the Company lacked the ability to produce a vehicle for commercial production, much less sales, in such a time period and had not progressed sufficiently by the time of the Business Combination, to believe that this goal was achievable.

87. FE-1[4] is a former Faraday employee who served as a Manufacturing Engineer/CNC Programmer from February 2018 to April or May 2020 at Faraday's Gardena, California corporate headquarters. She initially reported to Senior Manager of Additive Manufacturing, Shawn Zindroski, who in turn reported to Director of Lab Operations, Ralph Lawson. She later reported directly to Lawson.

88. In her role as a Manufacturing Engineer/CNC Programmer, FE-1 engineered and programmed the CNC machines and did design work, all of which involved work on the exterior of the FF 91 vehicle.

89. FE-1 stated that "parts didn't fit" on the vehicle. "Interior parts, the gapping of the door panels were off" and "it was just band aid after band aid" because "nothing fit correctly." On "some of the cars", "so much" of a polyester putty product usually used to repair holes, dents, scratches, and other problems on vehicle exteriors would be added "just so" the outside panels of the car would fit together correctly. As manufacturing of the FF 91 was vital, accounting for a significant and material portion of Faraday's business and operations throughout the Class Period, Faraday's manufacturing of the FF

---

[4] The former Faraday employees in this Complaint are cited as "FE-_" in sequential numbers for ease of reference and to protect their identities.

AMENDED CLASS ACTION COMPLAINT: CASE NO. 2:21-CV-09914-CAS-JC

91 was part of Faraday's core business, all Defendants, and through them Faraday, would have had robust knowledge of significant aspects of that manufacturing, and knew about or recklessly disregarded Faraday's misclassification of the timeline for production.

90.     By the time she left in spring 2020, much of the technology used by the Company was "way outdated" and the Company was "still doing their R&D."

91.     Additionally, a supplier of foam used on both the exterior and interior of the car, RAMPF Polymer Solutions, would "harass" FE-1 because the supplier was not getting paid and eventually terminated its business with the Company.  As further detailed by FE-2, a lack of payment to suppliers due to funding issues caused production to be delayed for a time where no prototypes were being built.

92.     FE-2 is a former Faraday employee who served as Senior Global Director – Advanced Manufacturing Engineering and Contract Manufacturing from February 2015 to November 2018 and Vice President of Manufacturing and Supply Chain from November 2018 to May 2020, both at Faraday's Gardena, California corporate headquarters.  She reported to Senior Vice President of Product Execution Bob Kruse, who in turn reported to Defendant Breitfeld.

93.     In her role as Senior Global Director – Advanced Manufacturing Engineering and Contract Manufacturing, FE-2's position involved vehicle components including stamping, body, paint, assembly, and propulsion.  As Vice President of Manufacturing and Supply Chain, FE-2's position involved contract development, global source analysis and implementation.

94.     When FE-2 left in May 2020, the Company was down to about 200 employees from more than 1,000 employees at its peak.  At this point, "the company had designed the FF 91 vehicles but still had to go through a number of validation and testing steps before the car could be produced and go to market."  After that, Faraday still had to produce a "final batch of validation vehicles" to conduct the federally required certifications.  The Company "had paused because of the funding situation that occurred."  FE-2 stated that when the Company paused, no prototypes were being built because "we

didn't have the funding to build."  By the time they were able to get the funding required, much time had passed and they had lost "a lot of resources internally," including people who "had the history and knowledge of the company."  Faraday had to rebuild trust with suppliers that had been "burnt by non-payment."  It would have taken "months of conversations" to regain the trust of suppliers.  When the funding came back, "it would be longer than 12 months" to be production-ready with the added supply chain challenges created by the COVID-19 pandemic.  If suppliers decided to continue working with Faraday once the Company obtained funding, they "would have needed to build out their teams to work on Faraday's vehicles."  "It only takes one part – you can't ship a vehicle if they are 99% sourced," so even a small delay "can delay your whole program."  To date, Faraday has not produced a single vehicle for commercial sale.

### 5.    Defendants Knew that the Company's Reservation Figures and Progress Were Overstated

95.    The allegations in this subsection relate solely to Plaintiffs' claims under Section 10(b) and 20(a) of the Exchange Act.

96.    Former employees have confirmed that Faraday and the Faraday Individual Defendants had access to and/or direct knowledge of the Company's reservation figures.

97.    Two former employees (FE-3 and FE-4), who each worked at Faraday's Gardena, California corporate headquarters, confirmed that Defendants had access to weekly and biweekly reports showing reservation figures throughout the Class Period, and that the Individual Defendants discussed these reports at meetings with other executive leaders and Company officers.

98.    FE-3 is a former Faraday employee who served as a Non-Production/Production Materials and Logistics Lead from June 2015 to September 2018, when she transitioned to an IT Asset Manager.  She served as an IT Asset Manager until she left the Company in May 2020 and reported directly to IT Lead Steve Du, who reported to Senior Director—Process and IT Rajesh Gujari, who reported for a limited time to Senior Executive Advisor—IT, Wolfgang Grotke.

99.     In her role as Non-Production/Production Materials and Logistics Lead, FE-3 prepared lithium ion battery and cell shipments, coordinated material and equipment transfers, scheduled facility maintenance work, and held other logistical responsibilities. In her role as IT Asset Manager, she oversaw computer and other technological equipment and managed inventory.

100.     FE-3 was among the employees who helped set up the microphones and speakers for weekly and biweekly all-hands meetings where the Company discussed reservation numbers.  Defendants Breitfeld and Jia attended these meetings as well as other executive leaders and Company officers.

101.     FE-4 also confirmed that Defendants had access to weekly and biweekly reports showing reservation figures throughout the Class Period, and that the Individual Defendants discussed these reports at meetings with other executive leaders and Company officers.  FE-4 was employed by the Company as a Vehicle Manager and Director—Global Accessories, Parts, Service and Delivery from October 2016 to June 2019.  FE-4 initially reported directly to President of Go-To-Market Strategy, Allen Lu, who in turn reported to Global EVP Tin Mok.  Tin Mok reported to Defendant Jia.  FE-4 later reported directly to Global EVP Tin Mok.

102.     In her role as Vehicle Manager and Director—Global Accessories, Parts, Service and Delivery, FE-4 managed an existing parts operations group and, as a director, oversaw all parts and services operations, which involved setting up accessories and getting parts for FF 91 vehicles.

103.     According to FE-4, Defendant Jia, along with other executive leaders and Company officers, provided updates on reservation numbers to employees during the all-hands meetings.

### 6.     When Investors Learned the Truth about the Company's Reservations and Progress in Developing a Car, FF's Stock Price Dropped Precipitously

104.     Through a series of corrective disclosures over two dates, investors learned that the Defendants and Company had misrepresented that Faraday had 14,000

reservations, and had misrepresented that Faraday could produce a vehicle within twelve months of the Business Combination.

### a.      October 7, 2021

105.   The truth began to emerge on October 7, 2021 when J Capital Research published a report titled "Move Over Lordstown: There's a New EV Scam in Town".  In that report, J Capital Research alleged, among other things, that Faraday was unlikely to ever sell a car, noting that after eight years in business, the Company has "failed to deliver a car," "has reneged on promises to build factories in five localities in the U.S. and China," "is being sued by dozens of unpaid suppliers," and "has failed to disclose that assets in China have been frozen by courts."

106.   Moreover, the J Capital Report alleged that Faraday's claimed 14,000 deposits are fabricated because 78% of these reservations (10,900) were made by a single undisclosed company that was an affiliate of Faraday.  The J Capital Report further noted:

> In January 2021, the company claimed it had 14,000 reservations for the car—until one week after Hindenburg published its findings that Lordstown's orders were faked.  Without explanation, after March 19, FFIE no longer made reference to the number of reservations.  In fact, these reservations—78% of which were from a single company—had been converted in 2020 to a note payable earning 8% interest.  The company strongly implies that the mystery booker, who was apparently ready to spend well over $1 bln on FFIE cars, may be an "affiliate."  They fail to say who it was.  In H1 2021, despite the upcoming SPAC merger, FFIE took in just $144,000 in new customer deposits.

107.   The J Capital Report further alleged that contrary to representations of progress toward manufacturing made by Faraday in September 2021, former engineering executives did not believe that the car was ready for production.

108.   The J Capital Report alleged that Faraday has reneged on promises to build five other factories, North Las Vegas and Vallejo, California in the U.S. and, in China, Deqing in Zhejiang, Zhuhai, and Guangzhou.  Faraday announced in June 2017 that it would stop work on its $1 billion North Las Vegas factory and sold the site for the factory in September 2019.  The Company announced it was scrapping its plan to build a facility in Velljo, California in March 2017.  In 2019, the Company announced that it had settled

23
AMENDED CLASS ACTION COMPLAINT: CASE NO. 2:21-CV-09914-CAS-JC

a dispute with major investor, EverGrande Group, reportedly giving Evergrande the Guangzhou factory in return for money.

109. The J Capital Report confirmed that Defendant Jia has been banned for life from being associated with publicly listed companies in China. In 2020, Defendant Jia was determined by the Shenzhen Stock Exchange of China to be unsuitable for a position as director, supervisor or executive officer of publicy listed companies in China as a result of violation by a public company founded and controlled by Defendant Jia in China of several listing rules, including illegal provision of funding and guarantees by the company to other affiliated companies founded by Defendant Jia, discrepancies in the company's forecast and financials, and improper use of proceeds from the company's public offering. Because of Defendant Jia, Faraday's USD accounts in China have been frozen by regulators, as evidenced by a Hong Kong arbitration agreement between Defendant Jia and Evergrande. Defendant Jia still holds the title of Chief Product & User Ecosystem Officer of the Company. The Company admitted in February 2022 that Defendant Jia's "involvement in the management of the Company post-Business Combination was more significant than what had been represented to certain investors."

110. On this news, the Company's share price fell $0.35 per share, or more than 4%, to close at $8.05 per share on October 8, 2021.

**b. November 15, 2021**

111. On November 15, 2021, Faraday announced that it would be unable to file its Form 10-Q for the fiscal quarter ended September 30, 2021 on time. Faraday further announced that its board of directors "formed a special committee of independent directors to review allegations of inaccurate disclosures," including the claims in the J Capital Report.

112. On this news, the Company's share price fell $0.28 per share, or approximately 3%, to close at $8.83 per share on November 16, 2021.

### c.  November 23, 2021

113.  On November 23, 2021, Faraday announced that it received a letter from The Nasdaq Stock Market dated November 17, 2021 (the "Nasdaq Letter") indicating that the Company was not in compliance with Nasdaq Listing Rule 5250(c)(1).  The Nasdaq Letter was issued in accordance with standard Nasdaq procedures due to the delayed filing of the Company's Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2021 (the "Q3 Form 10-Q").  The Nasdaq Letter advised the Company that it was permitted 60 calendar days to submit a plan to regain compliance with Nasdaq Listing Rule 5250(c)(1), and that the Nasdaq staff could grant the Company an exception, up to 180 calendar days from the due date of the Q3 Form 10-Q, to regain compliance. The Nasdaq Letter further advised the Company that it would be placed on a list of non-compliant Nasdaq companies within five business days of November 17, 2021.

114.  On this news, the Company's share price fell $0.60 per share, or approximately 8%, to close at $6.00.

### d.  February 1, 2022

115.  On February 1, 2022, Faraday announced that the Special Committee had completed its previously announced investigation into allegations of inaccurate disclosures, including claims contained in the J Capital Report issued during October 2021.  The Special Committee found that the Company's statements leading up to the Business Combination that it had received more than 14,000 reservations for the FF 91 vehicle "were potentially misleading because only several hundred of those reservations were paid, while the others (totaling 14,000) were unpaid indications of interest." Among other things, the Special Committee also identified "certain inconsistencies in statements to investors and certain weaknesses in its corporate controls and culture, as detailed in the Form 8-K."

116.  In connection with its review, the Special Committee recommended certain remedial actions to enhance oversight and corporate governance, including the appointment of Sue Swenson, currently the Audit Committee Chairperson, to the newly created position of Executive Chairperson.  Faraday disclosed that "additional

25

AMENDED CLASS ACTION COMPLAINT: CASE NO. 2:21-CV-09914-CAS-JC

investigative and remedial work based on the Special Committee's findings and actions will be performed under the direction of Mr. Swenson as Executive Chairperson and reporting to the Audit Committee."

117.   The Special Committee also approved strengthening internal controls including hiring a chief compliance officer and hiring of additional financial and accounting support.  Moreover, the Company admitted that the allegations of the J Capital Report with respect to false statements regarding 14,000 reservations were correct. More specifically, Faraday announced the following:

- "The ***Company's statements*** leading up to the Business Combination that it had received more than 14,000 reservations for the FF 91 vehicle ***were potentially misleading*** because only several hundred of those reservations were paid, while the others (totaling 14,000) were unpaid indications of interest."

- "[C]onsistent with the Company's previous public disclosures regarding identified material weaknesses in its internal controls, the Company's internal controls over financial accounting and reporting require an upgrade in personnel and systems."

- "[T]he Company's corporate culture failed to sufficiently prioritize compliance."

- The Company would continue its investigation, "including regarding whether inaccurate disclosures were made relating to its corporate housing arrangements and its related party disclosures."

- The Company would upgrade its internal controls over financial accounting and reporting.

- "The Company will assess and enhance its policies and procedures regarding financial accounting and reporting and hire additional financial reporting and accounting support, in each case at the direction of the Audit Committee."

118.   On this news, the Company's share price fell $0.34 per share, or more than 7%, to close at $4.22 per share on February 2, 2022.

### e.    March 31, 2022

119.   On March 31, 2022, Faraday announced that it was unable to file its Form 10-K within the prescribed time period, and did not expect to file it by the extended filing date pursuant to SEC Rule 12b-25, as a result of delays related to internal investigation work and remediation efforts.

120.   The announcement revealed that "the Company continues to implement the appropriate remedial actions approved by the Special Committee and continues the additional investigative work and remedial work as recommended by the Special Committee, under the direction of the Executive Chairperson and reporting to the Audit Committee of the Company's Board of Directors.   That work may result in further findings and remedial actions."

121.   The press release also revealed that the SEC had commenced an investigation into the disclosure issues facing the Company:

> Subsequent to the February 1 Form 8-K, the Company, certain members of the management team and employees of the Company received a notice of preservation and subpoena from the staff of the SEC stating that the SEC had commenced a formal investigation relating to the matters that were the subject of the Special Committee investigation. The Company, which had previously voluntarily contacted the SEC in connection with the Special Committee investigation, is cooperating fully with the SEC's investigation.

122.   On this news, the Company's share price fell $0.17 per share, or more than 3%, to close at $4.99 per share on March 31, 2022.

### f.   April 7, 2022

123.   On April 7, 2022, Faraday announced that it received a letter from the Listing Qualification Department of the NASDAQ indicating that the Company was out of compliance with NASDAQ Listing Rule 5250(c)(1) for continued listing, resulting in delisting of the Company's securities.

124.   On this news, the Company's share price fell $0.05 per share, or more than 1%, to close at $4.19 per share on April 7, 2022.

### g.   April 14, 2022

125.   On April 14, 2022, Faraday announced that "additional investigative and remedial work in connection with the independent investigation has now been completed and on April 12, 2022, the Board approved certain additional remedial actions, effective immediately."   In particular, the Company announced the following:

- Yueting (YT) Jia, the Company's founder, would no longer serve as an executive officer of the Company.

- Matthias Aydt, Senior Vice President, Business Development and Product Definition and a member of the Board, has been placed on probation as an executive officer for a six-month period effective immediately. During his period, he will remain as a non-independent member of the Board; and

- Certain other disciplinary actions and terminations of employment with respect to other Company employees (none of whom is an executive officer).

126. The foregoing remedial actions were taken for multiple reasons including but not limited to such persons' (1) failure to fully disclose to the Company their relationships with certain related parties and affiliated entities in connection with the Company's July 2021 business combination with PSAC; (2) failure to fully disclose similar, potentially relevant information to individuals involved in the preparation of the Company's periodic SEC filings; and (3) lack of cooperation and withholding of potentially relevant information in connection with the Special Committee investigation.

127. On this news, the Company's share price fell $0.12 per share, or more than 2%, to close at $4.50 per share on April 14, 2022.

## B. False and Misleading Statements for the Exchange Act Claims

### 1. January 28, 2021

128. The Class Period begins on January 28, 2021. On that day, PSAC and Legacy FF issued a press release titled "Faraday Future to List on NASDAQ Through Merger With Property Solutions Acquisition Corp. With Estimated $1 Billion in Proceeds." In that release, they announced that PSAC and Legacy FF entered into a definitive agreement for a business combination, and that following the closing, the combined company would be listed on the NASDAQ. The press release stated, in relevant part:

> FF's flagship product offering will be the FF 91 . . . . FF 91 is targeted to launch within twelve months after closing of the merger.
>
> [. . .]
>
> As the world's only tech-luxury intelligent Internet electric vehicle brand, FF expects to sell more than 400,000 units cumulatively over the next five years, and its first flagship model, the FF 91, has received over 14,000 reservations.

129. The statements in ¶ 128 were materially false and misleading because: (1) of the 14,000 reservations Faraday claimed to have received for the FF 91 vehicle, only several hundred were paid reservations for which the prospective customer had given a deposit, while the remaining were merely unpaid indications of interest; (2) 78% of the 14,000 reservations Faraday claimed to have received for the FF 91 vehicle were made by a single undisclosed company that is an affiliate of Faraday; (3) the FF 91 was not "targeted to launch" within twelve months after closing of the merger because wide-scale production within such a time frame was not achievable when the statement was made; and (4) the statement omitted to disclose the present facts that the company faced hurdles in development, manufacturing, and regulatory steps that made achieving production of the FF 91 and generating revenue from it within a year impossible.

130. On the same day, the Company published the text of a conference call announcing the Business Combination. In that text, Defendant Vogel stated, in relevant part:

> Faraday Future has already invested more than $2 billion in capital, they have been developing the FF 91 for almost four years, and are less than a year away from production and meaningful revenue.

131. The statement in ¶ 130 was materially false and misleading because: (1) the Company was not "less than a year away" from commercial production and generating "meaningful revenue"; and (2) the statement omitted to disclose the present facts that the Company faced hurdles in development, supply, manufacturing, and regulatory steps that made achieving production of the FF 91 and generating revenue from it within a year not merely optimistic, but impossible.

## 2. March 19, 2021

132. On March 19, 2021, the Company published the text of a Q&A session with IPO Edge, in which it stated, in relevant part:

> The transaction is expected to fully fund the production of our flagship halo vehicle, the luxury electric FF 91, within 12 months of close.

[. . .]

We have existing demand for the FF 91 by way of more than 14,000 reservations . . . .

133. The statements in ¶ 132 of the Q&A session were materially false and misleading because: (1) of the 14,000 reservations Faraday claimed to have received for the FF 91 vehicle, only several hundred were paid reservations for which the prospective customer had given a deposit, while the remaining were merely unpaid indications of interest; (2) 78% of the 14,000 reservations Faraday claimed to have received for the FF 91 vehicle were made by a single undisclosed company that is an affiliate of Faraday; (3) the FF 91 was not expected to be produced within twelve months after closing of the merger because such a time frame was not achievable when the statement was made; and (4) the statement omitted to disclose the present facts that the Company faced hurdles in development, supply, manufacturing, and regulatory steps that made achieving production of the FF 91 and generating revenue from it within a year not merely optimistic, but impossible.

### 3. April 5, 2021

134. On April 5, 2021, PSAC filed its Registration Statement on Form S-4 with the SEC in connection with the merger. In the Registration Statement, the Company stated, in relevant part:

> FF expects to start commercial sales of FF 91 series within twelve months after closing of the Business Combination . . . .
>
> [. . .]
>
> FF plans to commence commercial sales of its first vehicle, FF 91 series, within twelve months after closing of the Business Combination . . . .
>
> [. . .]
>
> FF plans to continue to build-out its leased manufacturing facility in Hanford, California to commence production of FF 91 series within twelve months after closing of the Business Combination.
>
> [. . .]
>
> FF intends to commercially launch FF 91 series within twelve months after closing of the Business Combination. Toward that goal, FF has completed most of the vehicle development milestones, including 29 prototype and 13 pre-production assets.

[. . .]

Unlike many competitors, FF has the advantage of speed to market as it is positioned to launch a production try-out in 9 months and commercial production of FF 91 series within 12 months after the Business Combination. FF has completed 29 prototypes and 13 pre-production assets and has completed most of the vehicle development hurdles including feasibility, concept and development phases.  As of the date hereof, 94% of the key components for FF 91 have been sourced, 91% production tooling is complete and 75% of production equipment is complete.

[. . .]

FF expects to derive revenue from FF 91, which is anticipated to launch twelve months after the closing of the Business Combination.

135.   The statements in ¶ 134 were materially false and misleading because:  (1) the FF 91 could not be produced within twelve months after closing of the merger; and (2) the statement omitted to disclose the present facts that the Company faced hurdles in development, manufacturing, and regulatory steps that made achieving production of the FF 91 and generating revenue from it within a year impossible.

136.   The Registration Statement incorporated by reference the Company's January 28, 2021 press release by stating, in relevant part, "Prior to market open January 28, 2021, PSAC and FF jointly issued a press release announcing the signing of the Merger Agreement, and PSAC filed a Current Report on Form 8-K announcing the execution of the Merger Agreement and discussing the key terms of the Merger Agreement in detail."  In the Company's January 28, 2021 press release, the Company stated, in relevant part:

FF expects to sell more than 400,000 units cumulatively over the next five years, and its first flagship model, the FF 91, has received over 14,000 reservations.

137.   The statements in ¶ 136 were materially false and misleading because:  (1) of the 14,000 reservations Faraday claimed to have received for the FF 91 vehicle, only several hundred were paid reservations for which the prospective customer had given a deposit, while the remaining were merely unpaid indications of interest; and (2) 78% of the 14,000 reservations Faraday claimed to have received for the FF 91 vehicle were made by a single undisclosed company that is an affiliate of Faraday.

31

138.   The Registration Statement was subsequently amended on June 1, 2021, June 21, 2021, and June 23, 2021, with each subsequent amendment containing the same false and misleading statements found in ¶¶ 135, 137, including those incorporated by reference.

### 4.   June 24, 2021

139.   On June 24, 2021, PSAC filed its Proxy statement on Form 424(b)(3), soliciting stockholder approval of the Business Combination.  In the Proxy statement, the Company stated, in relevant part:

> FF expects to start commercial sales of FF 91 series within twelve months after closing of the Business Combination . . . .
>
> [. . .]
>
> FF plans to commence commercial sales of its first vehicle, FF 91 series, within twelve months after closing of the Business Combination . . . .
>
> [. . .]
>
> FF plans to continue to build-out its leased manufacturing facility in Hanford, California to commence production of FF 91 series within twelve months after closing of the Business Combination.
>
> [. . .]
>
> Currently FF's initial vehicle FF 91 is expected to be launched within 12 months of funding.
>
> [. . .]
>
> FF intends to commercially launch FF 91 series within twelve months after closing of the Business Combination.  [. . .]  Toward that goal, FF has completed most of the vehicle development milestones, including 29 prototype and 13 pre-production assets.
>
> [. . .]
>
> Unlike many competitors, FF has the advantage of speed to market as it is positioned to launch a production try-out in 9 months and commercial production of FF 91 series within 12 months after the Business Combination.  [. . .]  FF has completed 29 prototypes and 13 pre-production assets and has completed most of the vehicle development hurdles including feasibility, concept and development phases.  As of the date hereof, 94% of the key components for FF 91 have been sourced, 91% production tooling is complete and 75% of production equipment is complete.
>
> [. . .]

FF intends to commercially launch the FF 91 within twelve months after closing of the Business Combination.

[. . .]

FF expects to derive revenue from the FF 91, which is anticipated to launch twelve months after the closing of the Business Combination.

140.   The statements in ¶ 139 were materially false and misleading because:  (1) the FF 91 could not be produced within twelve months after closing of the merger; and (2) the statement omitted to disclose the present facts that the Company faced hurdles in development, supply, manufacturing, and regulatory steps that made achieving production of the FF 91 and generating revenue from it within a year not merely optimistic, but impossible.

141.   The Proxy incorporates by reference the Company's January 28, 2021 press release by stating, in relevant part, "Prior to market open January 28, 2021, PSAC and FF jointly issued a press release announcing the signing of the Merger Agreement, and PSAC filed a Current Report on Form 8-K announcing the execution of the Merger Agreement and discussing the key terms of the Merger Agreement in detail."  In the Company's January 28, 2021 press release, the Company stated, in relevant part:

As the world's only tech-luxury intelligent Internet electric vehicle brand, FF expects to sell more than 400,000 units cumulatively over the next five years, and its first flagship model, the FF 91, has received over 14,000 reservations.

142.   The statements in ¶ 141 were materially false and misleading because:  (1) of the 14,000 reservations Faraday claimed to have received for the FF 91 vehicle, only several hundred were paid reservations for which the prospective customer had given a deposit, while the remaining were merely unpaid indications of interest; and (2) 78% of the 14,000 reservations Faraday claimed to have received for the FF 91 vehicle were made by a single undisclosed company that is an affiliate of Faraday.

### 5.   July 21, 2021

143.   On July 21, 2021, Faraday issued a press release titled "Faraday Future and Property Solutions Acquisition Corp. Announce Closing of Business Combination;

Faraday Future to Trade on NASDAQ Under Ticker 'FFIE' Beginning on July 22, 2021." The press release stated, in relevant part:

> The transaction proceeds are expected to fully finance the launch of the class defining FF 91 into the market within 12 months after closing . . . .

144.   The statement in in ¶ 143 was materially false and misleading because:  (1) the FF 91 could not be produced within twelve months after closing of the merger; and (2) the statement omitted to disclose the present facts that the Company faced hurdles in development, supply, manufacturing, and regulatory steps that made achieving production of the FF 91 and generating revenue from it within a year not merely optimistic, but impossible.

### 6.   September 19, 2021

145.   On September 19, 2021, Faraday published a "Futurist Day Presentation" titled "Faraday Future Hosts 919 Futurist Day Co-Creation Celebration and Announces New Business Initiatives as well as Positive Progress on FF 91 Production and Vehicle Delivery."  In the presentation, the Company, stated, in relevant part:

> The transaction is expected to fully fund the production of class-defining performance luxury electric FF 91 within 12 months of transaction close.

146.   The statement in in ¶ 145 was materially false and misleading because:  (1) the FF 91 could not be produced within twelve months after closing of the merger; and (2) the statement omitted to disclose the present facts that the Company faced hurdles in development, supply, manufacturing, and regulatory steps that made achieving production of the FF 91 and generating revenue from it within a year not merely optimistic, but impossible

### C.   Undisclosed Adverse Facts

147.   The market for Faraday's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, Faraday's securities traded at artificially inflated prices during the Class Period.  Plaintiffs and other members of the Class purchased or otherwise

acquired Faraday's securities relying upon the integrity of the market price of the Company's securities and market information relating to Faraday, and have been damaged thereby.

148.   During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Faraday's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Faraday's business, operations, and prospects as alleged herein.  These omissions also constituted violations of SEC Regulation S-K, Item 303.

149.   At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Faraday's financial well-being and prospects.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

**D.   Loss Causation**

150.   Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

151.   During the Class Period, Plaintiff and the Class purchased Faraday's securities at artificially inflated prices and were damaged thereby.  The price of the

Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

### E.   Additional Scienter Allegations

152.   The allegations in this subsection relate solely to Plaintiffs' claims under Section 10(b) and 20(a) of the Exchange Act.

#### 1.   Defendants Knew Beginning Wide-Scale Production of the FF 91 Within Twelve Months of the Business Combination Was Never Achievable

153.   Two former employees, (FE-3 and FE-4), who each worked at Faraday's Gardena, California corporate headquarters, confirmed that the Company was still doing R&D in Spring 2020, the Company was down from over 1,000 employees to about 200 employees, a number of validation and testing steps needed to occur before the car could be produced and go to market, and the Company needed to produce a "final batch of validation vehicles" to conduct the federally required certifications.

154.   Additionally, the Company had halted building prototypes because of a funding situation.  When the funding came back, FE-2 confirmed "it would be longer than 12 months" to be production-ready with the added supply chain challenges created by the COVID-19 pandemic.  FE-2 reported to Senior Vice President of Product Execution Bob Kruse, who in turn reported to Defendant Breitfeld.  Accordingly, throughout the Class Period, Defendants knew or were severely reckless in disregarding the risk that their public statements about the production timeline were misleading to a reasonable investor.

155.   As manufacturing of the FF 91 was vital, accounting for a significant and material portion of Faraday's business and operations throughout the Class Period, Faraday's manufacturing of the FF 91 was part of Faraday's core business, all Defendants, and through them Faraday, would have had robust knowledge of significant aspects of that manufacturing, and knew about or recklessly disregarded Faraday's misclassification of the timeline for production.

### 2. Defendants Had Access to Weekly and Biweekly Reports Showing Reservation Figures for the FF 91 Throughout the Class Period

156. Two former employees (FE-1 and FE-2), who each worked at Faraday's Gardena, California corporate headquarters, confirmed that Defendants had access to weekly and biweekly reports showing reservation figures throughout the Class Period, and that the Individual Defendants discussed these reports at meetings with other executive leaders and Company officers. Accordingly, throughout the Class Period, Defendants knew or were severely reckless in disregarding the risk that their public statements about reservation figures were misleading to a reasonable investor.

157. As sales of the FF 91 accounted for a significant and material portion of Faraday's business and operations throughout the Class Period, Faraday's sales of the FF 91 were part of Faraday's core business, all Defendants, and through them Faraday, would have had robust knowledge of significant aspects of those sales, and knew about or recklessly disregarded Faraday's misclassification of the reservations.

### 3. Faraday's CEO Defendant Jia Is "China's Best Known Securities Fraudster"

158. Defendant Jia has an undisputed history of securities fraud. This history is so egregious that he has been banned for life from being associated with publicly listed companies in China. In 2020, Defendant Jia was determined by the Shenzhen Stock Exchange of China to be unsuitable for a position as director, supervisor or executive officer of publicy listed companies in China as a result of violation by a public company founded and controlled by Defendant Jia in China of several listing rules, including illegal provision of funding and guarantees by the company to other affiliated companies founded by Defendant Jia, discrepancies in the company's forecast and financials, and improper use of proceeds from the company's public offering. Defendant Jia has repeatedly been designated by Chinese courts and regulatory bodies as a "Dishonest Person Subject to Legal Enforcement."

159. On October 14, 2019, Defendant Jia filed for bankruptcy in the U.S. Bankruptcy Court for the District of Delaware which was later transferred to Bankruptcy

Court for the Central District of California to address $3.6 billion in personal debts. Defendant Jia filed for bankruptcy as a result of guarantees or borrowing  made by him to fund his internet ecosystem and technology company, Le Holdings Co. Ltd., and other businesses he founded in China.  The Shanghai High People's Court froze $182 million of his assets when payments were not made.  Defendant Jia fled China for the United States in 2017 to escape what would have been certain detention for unpaid debts.

160.   On April 14, 2022, Faraday announced that Defendant Jia's role would be limited, and he would no longer be an executive officer following the Special Committee's findings of inaccurate statements made to investors.

### 4.   The Nature of SPACs Motivated Defendants To Take Liberties in Promoting the Company

161.   Defendants also had an incentive to take liberties in touting the quality of Faraday as an acquisition target because they stood to gain favorable employment by ensuring the SPAC successfully acquired a company that could employ them rather than returning the acquisition funds to investors.  SPACs also create perverse incentives for their key employees.  Because key employees of SPACs will lose their employment at the end of the life of the SPAC, they have an incentive to find a suitable target for acquisition without fail in order to obtain employment at the acquired company.  They also have incentives to choose one target over another based on the differing compensation they may receive through becoming an employee at different targets. These incentives may cause key employees to overlook problems at a target company they favor, or to present a target company in misleadingly favorable light to ensure the aquisition.

162.   According to Section 3.07 of the Merger Agreement, each of the Legacy FF investors, including the Faraday Individual Defendants, were to receive certain "earnout" payments conditioned upon certain public share price milestones within specified timeframes.

163.   The first tranche of 12.5 million Earnout Shares will issue if the share price of the Company's common securities reaches or exceeds $13.50 per share for any 20

trading days within any consecutive 30 trading-day period on or before July 21, 2026. Alternatively, the first tranche of 12.5 million Earnout Shares will issue in the event of a change in control on or before July 21, 2026, if the per-share consideration in such a transaction equals or exceeds $13.50.

164.   The second tranche of 12.5 million Earnout Shares will issue if the share price of the Company's common securities reaches or exceeds $15.50 per share for any 20 trading days within any consecutive 30 trading-day period on or before July 21, 2026. Alternatively, the second tranche of 12.5 million Earnout Shares will issue in the event of a change in control on or before July 21, 2026, if the per-share consideration in such a transaction equals or exceeds $15.50.

165.   The Faraday Individual Defendants continue to be eligible to receive Earnouts based on share price targets being obtained in the future.

**F.    Additional Reliance Allegations**

166.   To the extent Plaintiffs allege that Defendants made affirmative misstatements, Lead Plaintiff will rely, in part, upon the presumption of reliance established by the fraud on the market doctrine, in that, among other things:

> (a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
>
> (b)    the omissions and misrepresentations were material to a reasonable investor;
>
> (c)    the Company's securities traded in an efficient market;
>
> (d)    the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities;
>
> (e)    Plaintiffs and other members of the Class purchased the Company's securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts;

(f)     the Company's common stock met the requirements for listing and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(g)     as a regulated issuer, the Company filed periodic public reports with the SEC and the NASDAQ;

(h)     the Company regularly communicated with public investors via established market communication mechanisms, including inter alia regular dissemination of press releases on the national circuits of major newswire services and other wide ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(i)     the Company was followed by numerous securities analysts employed by major brokerage firms including, but not limited to, Roth Capital Partners, RBC Capital Markets, Cowen, Loop Capital, and Collers Securities, and other financial, tech and automotive website all of which wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace.

167.   As a result of the foregoing, the markets for the Company's securities were open, well-developed, and efficient at all relevant times, and promptly digested current information regarding the Company from publicly available sources and reflected such information in the Company's securities price(s).   Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of the Company's securities and market information relating to the Company.   Under these circumstances, all persons and entities who or which purchased or otherwise acquired the Company's securities during the Class Period suffered similar injuries through their purchase of the Company's securities at artificially inflated prices and thus, the presumption of reliance applies.

168.   During the Class Period, the artificial inflation of the Company's securities was caused by the material misrepresentations and/or omissions particularized herein, causing the damages sustained by Plaintiffs and other members of the Class.   On December 10, 2020, the Company's securities on the NASDAQ closed at a Class Period high of $22.00 per share.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about the Company's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of the Company and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated and maintained at artificially inflated levels at all relevant times, and when disclosed, negatively affected the value of the Company's shares.

169.   The material misrepresentations and omissions alleged herein would tend to induce, and did induce, reasonable investors to misjudge the value of the Company's common stock.  The material misrepresentations and omissions alleged herein would tend to induce, and did induce, reasonable investors to purchase the Company's securities at artificially inflated prices.

170.   Without knowledge of the misrepresented or omitted material facts alleged herein, Plaintiffs and other members of the Class purchased shares of the Company's common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

171.   To the extent Defendants concealed or improperly failed to disclose material facts with respect to the Company's business, Plaintiffs are entitled to a presumption of reliance in accordance with the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).  Defendants were obligated to disclose, but failed to disclose, material facts with respect to the Company's business operations and financial prospects, so that "positive proof of reliance is not a prerequisite to recovery." *Id.*

### G.    Class Action Allegations

172.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all those who purchased or otherwise acquired the Company's securities during the Class Period (the "Class"); and who were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are (i) Defendants; (ii) members of the immediate family of any Defendant who is a natural person; (iii) any person who was an officer or director of the Company during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) the Company's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors in interest, or assigns of any such excluded person.

173.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, the Company's securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by the Company, its transfer agent(s), or its domestic depositary(ies), and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

174.    Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

175.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigations.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

176.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

> (a)   whether the Defendants' acts and omissions as alleged herein violated the federal securities laws;
>
> (b)   whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, prospects, and management of the Company;
>
> (c)   whether the Individual Defendants caused the Company to issue false and misleading statements during the Class Period;
>
> (d)   whether Defendants acted knowingly or recklessly in issuing false and misleading statements;
>
> (e)   whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and
>
> (f)   whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

177.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class individually to redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action

## H.   No Safe Harbor

178.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements pleaded in this Amended Complaint.  The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  Additionally, to the extent certain of the statements

43

alleged to be false may be characterized as forward looking, they were not identified specifically as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

179.   In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those forward-looking statements because at the time each such statement was made, the speaker had actual knowledge, or recklessly disregarded the risk, that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Faraday who knew, or recklessly disregarded the risk, that the statement was false when made.

## I.   Claims Under Sections 10(b) and 20(a) of the Exchange Act

### 1.   COUNT ONE:  FOR VIOLATIONS OF SECTION 10(B) OF THE SECURITIES EXCHANGE ACT OF 1934 AND SEC RULE 10B-5 (AGAINST FARADAY, THE FARADAY INDIVIDUAL DEFENDANTS, AND THE PSAC DEFENDANTS)

180.   Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

181.   This Count is asserted against all Defendants, and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

182.   During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Faraday's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each Defendant, took the actions set forth herein.

183.   Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to

make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Faraday's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

184. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Faraday's financial well-being and prospects, as specified herein.

185. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Faraday's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Faraday and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

186. Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants

and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

187. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Faraday's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

188.  As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Faraday's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Faraday's securities during the Class Period at artificially high prices and were damaged thereby.

189.   At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity and believed them to be true.  Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that Faraday was experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Faraday securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

190.   By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

191.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**2.    COUNT TWO:  FOR VIOLATIONS OF SECTION 20(A) OF THE SECURITIES EXCHANGE ACT OF 1934 (AGAINST THE FARADAY INDIVIDUAL DEFENDANTS AND THE PSAC DEFENDANTS)**

192.   Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

193.   This Count is asserted against the Faraday Individual Defendants, the Securities Act Defendants, and the PSAC Defendants and is based upon Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

194.   The Faraday Individual Defendants, the Securities Act Defendants, and the PSAC Defendants acted as controlling persons of Faraday within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Faraday Individual Defendants, the Securities Act Defendants, and the PSAC Defendants had the power to influence and control and did influence and control, directly or indirectly, the

47

AMENDED CLASS ACTION COMPLAINT: CASE NO. 2:21-CV-09914-CAS-JC

decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.  The Faraday Individual Defendants, the Securities Act Defendants, and the PSAC Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

195.   In particular, the Faraday Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  The Securities Act Defendants and the PSAC Defendants also reviewed the Merger Agreement and voted to approve the Merger, signed the Proxy Solicitations, and solicited approval of the Merger.

196.   As set forth above, Faraday, the Faraday Individual Defendants, the Securities Act Defendants, and the PSAC Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their position as controlling persons, the Faraday Individual Defendants, the Securities Act Defendants, and the PSAC Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of the Faraday Individual Defendants', the Securities Act Defendants', and the PSAC Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**J.   Claims Under Sections 14(a) and 20(a) of the Exchange Act**

197.   The claims in Counts Three and Four below are brought under Sections 14(a) and 20(a) of the Exchange Act (the "Proxy Claims").  The Proxy Claims are brought on behalf of investors who beneficially owned and/or held PSAC Class A common stock as of the Record Date of June 21, 2021 and were eligible to vote at PSAC's July 20, 2021 special meeting.  The Proxy Claims are based solely on negligence.  They are not based

on any knowing or reckless conduct by or on behalf of Defendants, and Plaintiffs specifically disclaim any allegations of fraud, scienter or recklessness in these non-fraud claims.

198.   The basis of the Proxy Claims is that Defendants' statements issued to solicit shareholder approval of the Merger, including the Proxy, the documents incorporated into the Proxy, and the later-filed Proxy Supplements, contained misstatements and/or omissions of material facts.  Further, Defendants' later-filed Proxy Supplements did not, as required by law, update and correct their previously made misstatements, and themselves contained material misstatements and/or omissions.

199.   Defendants' proxy solicitations included all statements which served to color the market's view of the deal and encourage PSAC Class A common stockholders to vote in favor of the Merger.  These statements included the following (collectively referred to as the "Proxy Solicitations"):

> (a)   the Form S-4 Registration Statement filed on April 5, 2021, which included a Preliminary Proxy Statement Subject to Completion, dated April 5, 2021, as set forth above in ¶ 134;
>
> (b)   Amendment No. 1 to Form S-4 Registration Statement filed on May 28, 2021, which included a Preliminary Proxy Statement Subject to Completion, dated May 28, 2021, as set forth above in ¶ 138;
>
> (c)   Amendment No. 2 to Form S-4 Registration Statement filed on June 21, 2021, which included a Preliminary Proxy Statement Subject to Completion, dated June 21, 2021, as set forth above in ¶ 138;
>
> (d)   Amendment No. 3 to Form S-4 Registration Statement filed on June 23, 2021, which included a Preliminary Proxy Statement Subject to Completion, dated June 23, 2021, as set forth above in ¶ 138; and
>
> (e)   the Proxy Form 424(b)(3) filed on June 24, 2021, as set forth above in ¶ 139.

200.   All of the Proxy Solicitations were materially false and misleading.

201.   Among other things, the Proxy Solicitations included statements touting, for example, Faraday's "speed to market" or "ability to launch commercial production within 12 months after the Business Combination" which were materially false and misleading because they failed to disclose and/or misrepresented the material fact that the Company's cars were not as close to production as the Company claimed prior to the shareholder vote on June 15, 2021. The Proxy Solicitations explicitly incorporated by reference the Company's January 28, 2021 press release by stating, in relevant part, "Prior to market open January 28, 2021, PSAC and FF jointly issued a press release announcing the signing of the Merger Agreement, and PSAC filed a Current Report on Form 8-K announcing the execution of the Merger Agreement and discussing the key terms of the Merger Agreement in detail." In the Company's January 28, 2021 press release, the Company stated, in relevant part:

> FF expects to sell more than 400,000 units cumulatively over the next five years, and its first flagship model, the FF 91, has received over 14,000 reservations.

202.   The Company's statements that it had received more than 14,000 reservations for the FF 91 vehicle were potentially misleading because only several hundred of those reservations were paid, while the others (totaling 14,000) were unpaid indications of interest.

203.   Moreover, Defendants were under a continuing duty to update and/or correct these material misrepresentations and omissions by disclosing the relevant facts, as well as update and/or correct any false or misleading statements regarding Faraday. In violation of these duties, Defendants never disclosed any of the omitted facts or corrected the misleading statements before the shareholder vote. Significantly, Defendants updated and/or supplemented the Proxy four times, including on June 1, 21, 23 and 24, 2021, without correcting their misrepresentations or disclosing any of the material facts originally omitted.

204.   The materially false and misleading statements and omissions set forth above proximately caused foreseeable losses to Plaintiffs and members of the Class, as the risks

50

concealed by the false and misleading statements and omissions materialized through the corrective disclosures set forth above.

### 3.   COUNT THREE:  FOR VIOLATIONS OF SECTION 14(A) OF THE SECURITIES EXCHANGE ACT OF 1934 AND SEC RULE 14A-9 (FARADAY, THE FARADAY INDIVIDUAL DEFENDANTS, AND THE PSAC DEFENDANTS)

205.   Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein, except the allegations in those subsections specified to relate solely to Plaintiffs' claims under Section 10(b) and 20(a) of the Exchange Act.

206.   This claim does not sound in fraud.  For the purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct.  This claim is based solely on negligence.

207.   This claim is brought against all Defendants pursuant to Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)) and Rule 14a 9 promulgated thereunder (17 C.F.R. § 240.14a 9), on behalf of all former shareholders of PSAC who held shares of PSAC Class A common stock as of the Record Date and were entitled to vote at the PSAC special meeting on July 20, 2021 with respect to the Merger.

208.   Defendants' statements issued to solicit shareholder approval of the Merger, including the Proxy Statement, and the documents incorporated therein, and other proxy solicitation materials, contained statements that, at the time and in light of the circumstances under which they were made, were false and misleading with respect to material facts, and omitted to state material facts necessary in order to make the statements therein not false or misleading.

209.   Defendants named in this Count were required to but did not accurately update these statements between dissemination of these documents and the shareholder vote on June 20, 2021.

210. Defendants named in this Count, jointly and severally, solicited and/or permitted use of their names in solicitations contained in the Proxy Statement and other proxy solicitation materials.

211. By means of the Proxy Statement and documents attached thereto or incorporated by reference therein and other proxy solicitation materials, Defendants sought to secure Plaintiffs' and other Class members' approval of the Merger and solicited proxies from Plaintiffs and other members of the Class.

212. Each Defendant named in this Count acted negligently in making inaccurate statements of material facts, and/or omitting material facts required to be stated in order to make those statements not misleading. Defendants were required to ensure that the Proxy Statement and all other proxy solicitation materials fully and fairly disclosed all material facts to allow an investor to make an informed investment decision. These Defendants also acted negligently in failing to update the Proxy Statement.

213. The solicitations described herein were essential links in the accomplishment of the Merger.

214. Plaintiffs and other members of the Class eligible to vote on the Merger were misled by Defendants' false and misleading statements and omissions, were denied the opportunity to make a fully informed decision in voting on the Merger, and were damaged as a direct and proximate result of the untrue statements and omissions set forth herein.

215. The false and misleading statements and omissions in the Proxy Statement and other proxy solicitation materials are material in that a reasonable stockholder would consider them important in deciding how to vote on the Merger and/or whether to exercise their conversion right to receive $10.00 in cash per share of PSAC stock. In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the total mix of information made available in the Proxy Statement, additional proxy solicitation materials, and in other information reasonably available to stockholders.

216. The untrue statements and omissions as set forth above proximately caused foreseeable losses to Plaintiffs and other members of the Class.

217.   This claim is brought within the applicable statute of limitations.

218.   By reason of the foregoing, the Defendants violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and Rule 14a 9 promulgated thereunder, 17 C.F.R. § 240.14a 9.

### 4.   COUNT FOUR:  FOR VIOLATIONS OF SECTION 20(A) OF THE EXCHANGE ACT IN CONNECTION WITH THE PROXY CLAIMS (AGAINST THE FARADAY INDIVIDUAL DEFENDANTS AND THE PSAC DEFENDANTS)

219.   Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein, except the allegations in those subsections specified to relate solely to Plaintiffs' claims under Section 10(b) and 20(a) of the Exchange Act.

220.   This claim does not sound in fraud.  For the purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct.  This claim is based solely on negligence.

221.   This Count is asserted against the Faraday Individual Defendants, the Securities Act Defendants, and the PSAC Defendants and is based upon Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

222.   The Faraday Individual Defendants, the Securities Act Defendants, and the PSAC Defendants acted as controlling persons of Faraday within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Faraday Individual Defendants, the Securities Act Defendants, and the PSAC Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.  The Faraday Individual Defendants, the Securities Act Defendants, and the PSAC Defendants were provided with

or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

223. In particular, the Faraday Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. The Securities Act Defendants and the PSAC Defendants also reviewed the Merger Agreement and voted to approve the Merger, signed the Proxy Solicitations, and solicited approval of the Merger.

224. As set forth above, Faraday, the Faraday Individual Defendants, the Securities Act Defendants, and the PSAC Defendants each violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, the Faraday Individual Defendants, the Securities Act Defendants, and the PSAC Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

225. The solicitations described herein were essential links in the accomplishment of the Merger.

226. Plaintiffs and other members of the Class eligible to vote on the Merger were misled by Defendants' false and misleading statements and omissions, were denied the opportunity to make a fully informed decision in voting on the Merger, and were damaged as a direct and proximate result of the untrue statements and omissions set forth herein.

227. The false and misleading statements and omissions in the Proxy Statement and other proxy solicitation materials are material in that a reasonable stockholder would consider them important in deciding how to vote on the Merger and/or whether to exercise

their conversion right to receive $10.00 in cash per share of PSAC stock. In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the total mix of information made available in the Proxy Statement, additional proxy solicitation materials, and in other information reasonably available to stockholders.

228.   The untrue statements and omissions as set forth above proximately caused foreseeable losses to Plaintiffs and other members of the Class.

229.   This claim is brought within the applicable statute of limitations.

230.   By reason of the foregoing, the Faraday Individual Defendants and the PSAC Defendants violated Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

## IV.    VIOLATIONS OF THE SECURITIES ACT

231.   This Section and Counts herein expressly do not incorporate any of the Allegations in Section III. For purposes of this Section and the claims alleged herein, it is as though Section III is not part of this Complaint. As stated herein, the allegations in this Section arise under strict liability and/or negligence, and none of the allegations herein shall be interpreted as alleging intentional or reckless misconduct or alleging that any of the Defendants acted with scienter or fraudulent intent.

### A.    The Securities Act Plaintiffs

#### 1.    Plaintiffs

232.   On March 7, 2022, the Court appointed Byambadorj Nomin, Hao Guojun, Peihao Wang, and Shentao Ye to serve as Lead Plaintiffs in this action (ECF No. 33).

233.   Byambadorj Nomin, as set forth in a previously filed Certification (ECF No. 15-1), acquired Faraday securities at artificially inflated prices during the Class Period and suffered damages when corrective disclosures revealed Defendants' violations of the federal securities laws, as alleged herein.

234.   Hao Guojun, as set forth in a previously filed Certification (ECF No. 15-1), acquired Faraday securities at artificially inflated prices during the Class Period and suffered damages when corrective disclosures revealed Defendants' violations of the federal securities laws, as alleged herein.

235.   Peihao Wang, as set forth in a previously filed Certification (ECF No. 28-3), acquired Faraday securities at artificially inflated prices during the Class Period and suffered damages when corrective disclosures revealed Defendants' violations of the federal securities laws, as alleged herein.

236.   Shentao Ye, as set forth in a previously filed Certification (ECF No. 28-3), acquired Faraday securities at artificially inflated prices during the Class Period and suffered damages when corrective disclosures revealed Defendants' violations of the federal securities laws, as alleged herein.

237.   Additional Plaintiff Joshua Maa (ECF No. 18-1), as set forth in a previously filed Certification, acquired Faraday securities at artificially inflated prices during the Class Period and suffered damages when corrective disclosures revealed Defendants' violations of the federal securities laws, as alleged herein.

238.   Plaintiffs purchased shares pursuant and/or traceable to the Registration Statement in connection with the merger (the "Business Combination") on or around July 21, 2021.  Plaintiffs suffered economic losses when the true facts about the Company's reservations and production timeline were disclosed and the artificial inflation was removed from the price of the shares.

### 2.   Defendants

#### a.   Faraday Future Intelligent Electric Inc.

239.   Defendant Faraday is organized under the laws of Delaware, with principal executive offices located at 18455 S. Figueroa Street, Gardena, California 90248.  Shares of the Company's Class A common stock trade in an efficient market on the NASDAQ under the symbol "FFIE."  Its redeemable warrants trade on the NASDAQ under the symbol "FFIEW."  Each whole redeemable warrant is exercisable for one share of Class A common stock at an exercise price of $11.50 per share.  Prior to the Business Combination, PSAC's common stock traded on the NASDAQ exchange under the symbol "PSAC," and its redeemable warrants, exercisable for shares of common stock at an exercise price of $11.50 per share, traded under the symbol "PSACW."

### b.   The Faraday Individual Defendants

240.   Defendant Carsten Breitfeld ("Breitfeld") was the Chief Executive Officer ("CEO") of Legacy FF prior to the Business Combination, and the CEO of Faraday after the Business Combination.

241.   Defendant Zvi Glasman ("Glasman") was the Chief Financial Officer ("CFO") of Legacy FF prior to the Business Combination, and the CFO of Faraday after the Business Combination until October 27, 2021.

242.   Defendant Walter J. McBride ("McBride") was the CFO of Faraday from November 1, 2021 through the end of the Class Period.

243.   Defendant Yueting Jia ("Jia") is the Founder of Legacy FF.  He served as Chief Product and User Ecosystem Officer of Legacy FF and retained the position after the closing of the Business Combination.

244.   All references to the "Faraday Individual Defendants" in this Amended Complaint refer to Faraday, Breitfeld, Glasman, McBride, and Jia.

### c.   The Securities Act Defendants

245.   Defendant Jordan Vogel ("Vogel") was the Co-CEO of PSAC from its inception until the Business Combination.  Vogel signed the Registration Statement as "Chairman, Co-Chief Executive Officer and Secretary (Principal Executive Officer)."

246.   Defendant Aaron Feldman ("Feldman") was the Co-CEO and Treasurer of PSAC from its inception until the Business Combination.  Feldman signed the Registration Statement as "Co-Chief Executive Officer, Treasurer and Director (Principal Financial and Accounting Officer)."

247.   Defendant David Amsterdam ("Amsterdam") served on PSAC's board of directors from February 2020 until the Business Combination.  Defendant Amsterdam signed the Registration Statement as a "Director."

248.   Defendant Avi Savar "(Savar") served on PSAC's board of directors from February 2020 until the Business Combination.  Defendant Savar signed the Registration Statement as a "Director."

249.   Defendant Eduardo Abush ("Abush") served on PSAC's board of directors from February 2020 until the Business Combination.   Defendant Abush signed the Registration Statement as a "Director."

250.   All references to the "Securities Act Defendants" in this Amended Complaint refer to Vogel, Feldman, Amsterdam, Savar, and Abush.

### d.   The PSAC Defendants

251.   Defendant Vogel was the Co-CEO of PSAC from its inception until the Business Combination.

252.   Defendant Feldman was the Co-CEO and Treasurer of PSAC from its inception until the Business Combination.

253.   All references to the "PSAC Defendants" in this Amended Complaint refer to Vogel and Feldman.

254.   The Court has personal jurisdiction over the Faraday Individual Defendants, the Securities Act Defendants, and the PSAC Defendants because the Faraday Individual Defendants, the Securities Act Defendants, and the PSAC Defendants conducted substantial business in this District, and the events giving rise to Plaintiffs' claims arise out of and relate to the Faraday Individual Defendants', the Securities Act Defendants', and the PSAC Defendants' contacts with this District.   The Faraday Individual Defendants', the Securities Act Defendants', and PSAC Defendants' actions are controlled by the Company.   The Faraday Individual Defendants', the Securities Act Defendants', and PSAC Defendants' affiliations with this District are so continuous and systematic as to render them essentially at home in California.   Further, the Faraday Individual Defendants, the Securities Act Defendants, and PSAC Defendants have transacted business, maintained substantial contacts, purposefully targeted investors, and committed other overt acts in furtherance of the unlawful acts alleged herein in this District, as well as throughout the United States.   The unlawful acts of the Faraday Individual Defendants, the Securities Act Defendants, and PSAC Defendants have been directed at, have targeted, and have had the effect of causing injury to investors who are

citizens or nationals of the United States, and to investors who reside in, are located in, or are doing business in this District, as well as throughout the United States.

255.   The Faraday Individual Defendants, the Securities Act Defendants, and PSAC Defendants possessed the power and authority to control the contents of the Company's SEC filings, press releases, and other market communications.  The Faraday Individual Defendants, the Securities Act Defendants, and PSAC Defendants were provided with copies of the Company's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  The Faraday Individual Defendants, the Securities Act Defendants, and PSAC Defendants are liable for the false statements and omissions pleaded herein.

256.   The Faraday Individual Defendants, the Securities Act Defendants, and the PSAC Defendants are collectively referred to herein this Section as "the Individual Defendants."

257.   The Company, the Faraday Individual Defendants, the Securities Act Defendants, and the PSAC Defendants are collectively referred to herein this Section as "Defendants."

## B.   The Securities Act Allegations

### 1.   PSAC Incorporated as a SPAC and Merged with FF in 2021

#### a.   Formation and Purpose of the SPAC

258.   PSAC was a SPAC formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization, or similar business combination with one or more businesses.

259.   In July 2020, PSAC completed its initial public offering in which it sold an aggregate of 22,977,568 units at a price of $10.00 per unit, generating gross proceeds of $229,775,680.  Each unit was redeemable for $10.00 per share.  Simultaneously with the completion of the initial public offering, PSAC completed the private placement of 594,551 private units at a price of $10.00 per private unit, generating total proceeds of

AMENDED CLASS ACTION COMPLAINT: CASE NO. 2:21-CV-09914-CAS-JC

$5,945,513, to the Company's initial stockholders and EarlyBirdCapital, the sole book-running manager of the initial public offering.  A total of $229,775,680 from the net proceeds of the sale of the units in the initial public offering and the sale of the private units was placed in a trust account located in the United States.

260.   On July 2, 2020, in its registration statement filed with the SEC on Form S-1, PSAC represented that "We may pursue a business combination opportunity in any business or industry we choose although we currently intend to focus on target companies that service the real estate industry."

### b.      Faraday's Company History

261.   Faraday was founded in May 2014 by Chinese businessman, Defendant Jia Yueting.  The company is headquartered in Los Angeles where it has an R&D Center and Futurist Testing Lab.  The Company also has offices in Silicon Valley, Beijing, Shanghai, and Chengdu.

262.   Faraday's primary business appears to be the design and manufacturing of electric vehicles.  According to its website, Faraday "is a California-based global shared intelligent mobility ecosystem."  Faraday claims, "FF is poised to break the boundaries between the Internet, IT, creative, and auto industries with product and service offerings that integrate new energy, AI, Internet, and sharing models.  FF's vision is to create a

shared intelligent mobility ecosystem that empowers everyone to move, connect, breathe and live freely."

263.   In 2015, the Company announced that it would build a plant in North Las Vegas, Nevada.

264.   In 2017, Faraday revealed a mockup of its primary product focus, the FF 91 crossover vehicle, at the Consumer Electronics Show.  Faraday claimed at the time that production would begin in 2018.

265.   By the time the FF 91 was unveiled in 2017, Faraday had festering financial troubles.  Reports surfaced of Faraday's accumulating debts and lawsuits from suppliers.

266.   In July 2017, Faraday Future announced that its North Las Vegas factory plans had been scrapped.  In August 2017, Faraday signed a lease for a former Pirelli tire plant in Hanford, California, and a year later Faraday sold a 45 percent stake to Evergrande Group—a Chinese property developer incorporated in the Cayman Islands—for $854 million.  However, two months later Evergrande pulled out of the deal, Faraday began to make massive layoffs and salary cuts.

267.   In 2019, Defendant Jia filed for personal bankruptcy with over $3 billion in debt and stepped down from his role as CEO.

268.   Throughout this period, Faraday continued to promise the imminent arrival of the FF 91.  In 2017, upon revealing the FF 91, the Company stated that it would begin production of the car in 2018.  In 2018, the Company said it had built a pre-production prototype at the Hanford plant and said production would begin in 2019.  As explained further below, to date, Faraday has not produced a single vehicle for commercial sale, and misrepresented its progress to investors during the Class Period.

### c.   Faraday's FF 91 Electric Vehicle

269.   The primary specifications of the FF 91 have remained unchanged since the prototype was first revealed in 2017.  Three electric motors—two at the rear and one up front—supply a stated 1050 horsepower to all four wheels.  Faraday claims an acceleration rate of zero-to-60-mph in under 2.4 seconds for the crossover, which

measures 206.9 inches long.   The FF 91 relies on a 130.0-kWh battery pack, which Faraday says will provide a 378-mile range on the EPA test cycle.

270.   According to a Faraday spokesperson, the most updated prototype of the FF 91 vehicle features a new instrument panel, front and rear consoles, and production-intent exterior lighting.   It also features new exterior badging, a new production-spec lidar assembly mounted on the roof, and production paint.

271.   Faraday has suggested that the FF 91 will have a six-figure price and will compete with the Tesla Model X and Lucid Motors' Air.   Faraday claims that the top-of-the-line FF 91 Futurist Alliance model will cost more than $200,000, will be limited to 300 units, and will aim to compete with Bentley, Rolls-Royce, and Maybach.

272.   The Company claims that its Hanford plant will start production of the FF 91 with an annual volume of 10,000 units, and that the plant has room to expand to 30,000 vehicles per year.

### d.   Merger of PSAC and FF

273.   On January 27, 2021, PSAC, PSAC Merger Sub, Ltd. (an exempted company with limited liability incorporated under the laws of the Cayman Islands and wholly-owned subsidiary of PSAC) and Legacy FF.

274.   On January 28, 2021, PSAC and Legacy FF issued a press release announcing the Merger Agreement.   The press release, titled "Faraday Future to List on NASDAQ Through Merger With Property Solutions Acquisition Corp. With Estimated $1 Billion in Proceeds," stated that PSAC and Legacy FF had entered into a definitive agreement for a business combination, and that following the closing, the combined company would be listed on the NASDAQ.

275.   The transaction reportedly would provide an estimated $1.0 billion of gross proceeds to Faraday.   This amount included $230 million in cash held by PSAC in trust (assuming no redemptions) and $775 million from the sale of common stock through a so-called "private investment in public equity" or "PIPE."

AMENDED CLASS ACTION COMPLAINT: CASE NO. 2:21-CV-09914-CAS-JC

276.    To effect this PIPE, PSAC entered into agreements with certain accredited investors or qualified institutional buyers ("Subscription Investors").    In these agreements, the Subscription Investors agreed to purchase an aggregate of 79,500,000 shares of common stock of PSAC for a purchase price of $10.00 per share, or an aggregate of approximately $795 million.

277.    On July 21, 2021, the Company completed the Business Combination.    On that day, Faraday announced the closing in a press release that noted that "[u]pon the consummation of the Business Combination, the registrant changed its name from "Property Solutions Acquisition Corp." to "Faraday Future Intelligent Electric Inc."

278.    As of July 21, 2021, each outstanding FF share (or indicative FF share, with respect to such outstanding FF converting debt and such other outstanding liabilities of FF) converted into a number of shares of new Class A common stock of the Company following the Business Combination equal to an exchange ratio of 0.14130.

### 2.    Faraday Misled Investors About the Number of Reservations the Company Had Obtained and Its Progress in Bringing the FF 91 to Market

279.    In the Registration Statement, the Company and Defendants misrepresented to investors that it had received 14,000 reservations for the FF 91.    As explained in the following section, the Company in fact had received only a few hundred paid reservations compared to an overwhelming majority of unpaid indications of interest, as the Company expressly admitted in its January 26, 2022 press release.

280.    The difference between 14,000 paid reservations and a few hundred paid reservations is massive, and this difference was highly material to investors in the Company.    Even assuming a discount of 10% of the Company's claimed selling price for the FF 91 of approximately $200,000, the Company claimed in effect that it would achieve revenue of $2.520 billion soon after producing its first vehicle (i.e., $180,000 x 14,000 = $2.520 billion).    This amount vastly overstates the approximately $54 million in revenue the Company would have achieved from the few hundred paid reservations it actually held (i.e., $180,000 x 300 = $54 million).

281. On April 5, 2021, PSAC filed its Registration Statement and preliminary proxy statement on Form S-4 in connection with the merger. The Registration Statement was signed by Jordan Vogel, Aaron Feldman, David Amsterdam, Avi Savar and Eduardo Abush. In the Registration Statement, the Company stated:

> ***FF intends to commercially launch FF 91 series within twelve months after closing of the Business Combination.*** Toward that goal, FF has completed most of the vehicle development milestones, including 29 prototype and 13 pre-production assets. FF 91 series is designed to compete with Maybach, Bentley Bentayga, Lamborghini Urus, Ferrari Purosangue, Mercedes S-Class, Porsche Taycan, BMW 7-Series etc.
>
> [. . .]
>
> FF has achieved major commercial milestones to bring its FF 91 model to the market. Unlike many competitors, FF has the advantage of speed to market as ***it is positioned to launch a production try-out in 9 months and commercial production of FF 91 series within 12 months after the Business Combination.*** FF has completed 29 prototypes and 13 pre-production assets and has completed most of the vehicle development hurdles including feasibility, concept and development phases. As of the date hereof, 94% of the key components for FF 91 have been sourced, 91% production tooling is complete and 75% of production equipment is complete.

282. The Registration Statement and Proxy Statement incorporated the January 28, 2021 press release with the following language:

> The Merger Agreement was signed on January 27, 2021. Prior to market open January 28, 2021, PSAC and FF jointly issued a press release announcing the signing of the Merger Agreement, and PSAC filed a Current Report on Form 8-K announcing the execution of the Merger Agreement and discussing the key terms of the Merger Agreement in detail.

283. Accordingly, the Registration Statement and Proxy Statement included the statement: "***[FF's] first flagship model, the FF 91, has received over 14,000 reservations* . . .***"

284. On June 21, 2021 and June 23, 2021, PSAC filed Amendments Number 2 and 3, respectively, to its Form S-4 Registration Statement, along with updated preliminary proxy statements. The amended Registration Statements were signed by Jordan Vogel, Aaron Feldman, David Amsterdam, Avi Savar and Eduardo Abush.

285.  On June 24, 2021, PSAC filed its Prospectus on Form 424(b)(3), soliciting stockholder approval of the merger with Legacy FF.

286.  On June 24, 2021, PSAC announced that the SEC had declared effective its Registration Statement on Form S-4.  PSAC also announced that a special meeting of PSAC stockholders would be held on July 20, 2021 at 11:00 a.m. Eastern Time (the "Special Meeting") to approve, among other things, the proposed business combination. The Prospectus and Registration Statement stated, in relevant part:

> FF has achieved major commercial milestones to bring its FF 91 model to the market.  Unlike many competitors, ***FF has the advantage of speed to market as it is positioned to launch a production try-out in 9 months and commercial production of FF 91 series within 12 months after the Business Combination***.

287.  The Prospectus, like the Registration Statement, explicitly incorporated by reference the January 28, 2021 press release:

> The Merger Agreement was signed on January 27, 2021.  Prior to market open January 28, 2021, PSAC and FF jointly issued a press release announcing the signing of the Merger Agreement, and PSAC filed a Current Report on Form 8-K announcing the execution of the Merger Agreement and discussing the key terms of the Merger Agreement in detail.

288.  Accordingly, the Registration Statement and Proxy Statement likewise included the statement:  "***[FF's] first flagship model, the FF 91, has received over 14,000 reservations*** . . . ."

289.  These and Defendants' numerous additional false and misleading statements and omissions are catalogued in their entirety below.

### 3.  Contrary to Its Claims, the Company Never Obtained More Than a Few Hundred Paid Reservations for Its Cars

290.  Faraday's and Defendants' misrepresentations that the Company had received over 14,000 reservations for the FF 91 were false and misleading.  In its January 26, 2022 Form 8-K current report, the Company conceded, not only that the Company and Defendants had misrepresented that Faraday had received over 14,000 reservations when it had in fact received only several hundred paid reservations, but also that this misrepresentation was "potentially misleading":

65
AMENDED CLASS ACTION COMPLAINT: CASE NO. 2:21-CV-09914-CAS-JC

The Company's statements leading up to the Business Combination that it had received more than 14,000 reservations for the FF 91 vehicle were potentially misleading because only several hundred of those reservations were paid, while the others (totaling 14,000) were unpaid indications of interest.

### 4. Contrary to Its Claims, Beginning Production of the FF91 Within Twelve Months of the Business Combination Was Never Achievable

291.   Defendant's misrepresentations that Faraday was able to begin producing the FF 91 within twelve months of the Business Combination were also false and misleading. Multiple confidential witnesses have confirmed that the Company lacked the ability to produce a vehicle for commercial production, much less sales, in such a time period, and had not progressed sufficiently by the time of the Business Combination, to believe that this goal was achievable.

292.   FE-1[5] is a former Faraday employee who served as a Manufacturing Engineer/CNC Programmer from February 2018 to April or May 2020 at Faraday's Gardena, California corporate headquarters.  She initially reported to Senior Manager of Additive Manufacturing, Shawn Zindroski, who in turn reported to Director of Lab Operations, Ralph Lawson.  She later reported directly to Lawson.

293.   In her role as a Manufacturing Engineer/CNC Programmer, FE-1 engineered and programmed the CNC machines and did design work, all of which involved work on the exterior of the FF 91 vehicle.

294.   FE-1 stated that "parts didn't fit" on the vehicle.  "Interior parts, the gapping of the door panels were off" and "it was just band aid after band aid" because "nothing fit correctly."  On "some of the cars", "so much" of a polyester putty product usually used to repair holes, dents, scratches, and other problems on vehicle exteriors would be added "just so" the outside panels of the car would fit together correctly.  Manufacturing of the FF 91 was vital, accounting for a significant and material portion of Faraday's business and operations throughout the Class Period.

---

[5] The former Faraday employees in this Complaint are cited as "FE-_" in sequential numbers for ease of reference and to protect their identities.

295.   By the time FE-1 left in spring 2020, much of the technology used by the Company was "way outdated" and the Company was "still doing their R&D."

296.   Additionally, a supplier of foam used on both the exterior and interior of the car, RAMPF Polymer Solutions, would "harass" FE-1 because the supplier was not getting paid and eventually terminated its business with the Company.  As further detailed by FE-2, a lack of payment to suppliers due to funding issues caused production to be delayed for a time where no prototypes were being built.

297.   FE-2 is a former Faraday employee who served as Senior Global Director – Advanced Manufacturing Engineering and Contract Manufacturing from February 2015 to November 2018 and Vice President of Manufacturing and Supply Chain from November 2018 to May 2020, both at Faraday's Gardena, California corporate headquarters.  She reported to Senior Vice President of Product Execution Bob Kruse, who in turn reported to Defendant Breitfeld.

298.   In her role as Senior Global Director – Advanced Manufacturing Engineering and Contract Manufacturing, FE-2's position involved vehicle components including stamping, body, paint, assembly, and propulsion.  As Vice President of Manufacturing and Supply Chain, FE-2's position involved contract development, global source analysis and implementation.

299.   When FE-2 left in May 2020, the Company was down to about 200 employees from more than 1,000 employees at its peak.  At this point, "the company had designed the FF 91 vehicles but still had to go through a number of validation and testing steps before the car could be produced and go to market."  After that, Faraday still had to produce a "final batch of validation vehicles" to conduct the federally required certifications.  The Company "had paused because of the funding situation that occurred." FE-2 stated that when the Company paused, no prototypes were being built because "we didn't have the funding to build."  By the time they were able to get the funding required, much time had passed and they had lost "a lot of resources internally," including people who "had the history and knowledge of the company."  Faraday had to rebuild trust with

suppliers that had been "burnt by non-payment." It would have taken "months of conversations" to regain the trust of suppliers. When the funding came back, "it would be longer than 12 months" to be production-ready with the added supply chain challenges created by the COVID-19 pandemic. If suppliers decided to continue working with Faraday once the Company obtained funding, they "would have needed to build out their teams to work on Faraday's vehicles." "It only takes one part – you can't ship a vehicle if they are 99% sourced," so even a small delay "can delay your whole program." To date, Faraday has yet to produce for the market a single FF 91 vehicle.

### 5. When Investors Learned the Truth about the Company's Reservations and Progress in Developing a Car, FF's Stock Price Dropped Precipitously

300. Through a series of corrective disclosures over two dates, investors learned that the Defendants and Company had misrepresented that Faraday had 14,000 reservations, and had misrepresented that Faraday could produce a vehicle within twelve months of the Business Combination.

### a. October 7, 2021

301. The truth began to emerge on October 7, 2021 when J Capital Research published a report titled "Move Over Lordstown: There's a New EV Scam in Town" (the "J Capital Report"). In that report, J Capital Research alleged, among other things, that Faraday was unlikely to ever sell a car, noting that after eight years in business, the Company has "failed to deliver a car," "has reneged on promises to build factories in five localities in the U.S. and China," "is being sued by dozens of unpaid suppliers," and "has failed to disclose that assets in China have been frozen by courts."

302. Moreover, the J Capital Report alleged that Faraday's claimed 14,000 deposits are fabricated because 78% of these reservations (10,900) were made by a single undisclosed company that was an affiliate of Faraday. The J Capital Report further noted:

> In January 2021, the company claimed it had 14,000 reservations for the car—until one week after Hindenburg published its findings that Lordstown's orders were faked. Without explanation, after March 19, FFIE no longer made reference to the number of reservations. In fact, these reservations—78% of which were from a single company—had been converted in 2020 to a note payable earning 8% interest. The company

strongly implies that the mystery booker, who was apparently ready to spend well over $1 bln on FFIE cars, may be an "affiliate." They fail to say who it was. In H1 2021, despite the upcoming SPAC merger, FFIE took in just $144,000 in new customer deposits.

303. The J Capital Report further alleged that contrary to representations of progress toward manufacturing made by Faraday in September 2021, former engineering executives did not believe that the car was ready for production.

304. The J Capital Report alleged that Faraday has reneged on promises to build five other factories, North Las Vegas and Vallejo, California in the U.S. and, in China, Deqing in Zhejiang, Zhuhai, and Guangzhou. Faraday announced in June 2017 that it would stop work on its $1 billion North Las Vegas factory and sold the site for the factory in September 2019. The Company announced it was scrapping its plan to build a facility in Velljo, California in March 2017. In 2019, the Company announced that it had settled a dispute with major investor, EverGrande Group, reportedly giving Evergrande the Guangzhou factory in return for money.

305. The J Capital Report confirmed that Defendant Jia has been banned for life from being associated with publicly listed companies in China. In 2020, Defendant Jia was determined by the Shenzhen Stock Exchange of China to be unsuitable for a position as director, supervisor or executive officer of public listed companies in China as a result of violations by a publicly company founded and controlled by Defendant Jia in China of several listing rules, including illegal provision of funding and guarantees by the Company to other affiliated companies founded by Defendant Jia, discrepancies in the company's forecast and financials, and improper use of proceeds from the company's public offering. Because of Defendant Jia, Faraday's USD accounts in China have been frozen by regulators, as evidenced by a Hong Kong arbitration agreement between Defendant Jia and Evergrande. Defendant Jia still holds the title of Chief Product & User Ecosystem Officer of the Company. The Company admitted in February 2022 that Defendant Jia's "involvement in the management of the Company post-Business Combination was more significant than what had been represented to certain investors."

306. On this news, the Company's share price fell $0.35 per share, or more than 4%, to close at $8.05 per share on October 8, 2021.

### b. November 15, 2021

307. On November 15, 2021, Faraday announced that it would be unable to file its Form 10-Q for the fiscal quarter ended September 30, 2021 on time. Faraday further announced that its board of directors "formed a special committee of independent directors to review allegations of inaccurate disclosures," including the claims in the J Capital Report.

308. On this news, the Company's share price fell $0.28 per share, or approximately 3%, to close at $8.83 per share on November 16, 2021.

### c. November 23, 2021

309. On November 23, 2021, Faraday announced that it received a letter from The Nasdaq Stock Market dated November 17, 2021 (the "Nasdaq Letter") indicating that the Company was not in compliance with Nasdaq Listing Rule 5250(c)(1). The Nasdaq Letter was issued in accordance with standard Nasdaq procedures due to the delayed filing of the Company's Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2021 (the "Q3 Form 10-Q"). The Nasdaq Letter advised the Company that it was permitted 60 calendar days to submit a plan to regain compliance with Nasdaq Listing Rule 5250(c)(1), and that the Nasdaq staff could grant the Company an exception, up to 180 calendar days from the due date of the Q3 Form 10-Q, to regain compliance. The Nasdaq Letter further advised the Company that it would be placed on a list of non-compliant Nasdaq companies within five business days of November 17, 2021.

310. On this news, the Company's share price fell $0.60 per share, or approximately 8%, to close at $6.00.

### d. February 1, 2022

311. On February 1, 2022, Faraday announced that the special committee of independent Company directors (the "Special Committee") had completed its previously announced investigation into allegations of inaccurate disclosures, including claims

contained in the J Capital Report issued during October 2021. The Special Committee found that the Company's statements leading up to the Business Combination that it had received more than 14,000 reservations for the FF 91 vehicle "were potentially misleading because only several hundred of those reservations were paid, while the others (totaling 14,000) were unpaid indications of interest." Among other things, the Special Committee also identified "certain inconsistencies in statements to investors and certain weaknesses in its corporate controls and culture, as detailed in the Form 8-K."

312. In connection with its review, the Special Committee recommended certain remedial actions to enhance oversight and corporate governance, including the appointment of Sue Swenson, currently the Audit Committee Chairperson, to the newly created position of Executive Chairperson. Faraday disclosed that "additional investigative and remedial work based on the Special Committee's findings and actions will be performed under the direction of Mr. Swenson as Executive Chairperson and reporting to the Audit Committee."

313. The Special Committee also approved strengthening internal controls including hiring a chief compliance officer and hiring of additional financial and accounting support. Moreover, the Company admitted that the allegations of the J Capital Report with respect to false statements regarding 14,000 reservations were correct. More specifically, Faraday announced the following:

> "The **Company's statements** leading up to the Business Combination that it had received more than 14,000 reservations for the FF 91 vehicle **were potentially misleading** because only several hundred of those reservations were paid, while the others (totaling 14,000) were unpaid indications of interest."

> "[C]onsistent with the Company's previous public disclosures regarding identified material weaknesses in its internal controls, the Company's internal controls over financial accounting and reporting require an upgrade in personnel and systems."

> "[T]he Company's corporate culture failed to sufficiently prioritize compliance."

> The Company would continue its investigation, "including regarding whether inaccurate disclosures were made relating to its corporate housing arrangements and its related party disclosures."

The Company would upgrade its internal controls over financial accounting and reporting.

"The Company will assess and enhance its policies and procedures regarding financial accounting and reporting and hire additional financial reporting and accounting support, in each case at the direction of the Audit Committee."

314.    On this news, the Company's share price fell $0.34 per share, or more than 7%, to close at $4.22 per share on February 2, 2022.

### e.    March 31, 2022

315.    On March 31, 2022, Faraday announced that it was unable to file its Annual Report on Form 10-K for the year ended December 31, 2021 (the "Form 10-K") within the prescribed time period, and did not expect to file it by the extended filing date pursuant to SEC Rule 12b-25, as a result of delays related to internal investigation work and remediation efforts.

316.    The announcement revealed that "the Company continues to implement the appropriate remedial actions approved by the Special Committee and continues the additional investigative work and remedial work as recommended by the Special Committee, under the direction of the Executive Chairperson and reporting to the Audit Committee of the Company's Board of Directors.   That work may result in further findings and remedial actions."

317.    The press release also revealed that the SEC had commenced an investigation into the disclosure issues facing the Company:

Subsequent to the February 1 Form 8-K, the Company, certain members of the management team and employees of the Company received a notice of preservation and subpoena from the staff of the SEC stating that the SEC had commenced a formal investigation relating to the matters that were the subject of the Special Committee investigation.   The Company, which had previously voluntarily contacted the SEC in connection with the Special Committee investigation, is cooperating fully with the SEC's investigation.

318.    On this news, the Company's share price fell $0.17 per share, or more than 3%, to close at $4.99 per share on March 31, 2022.

### f.    April 7, 2022

319.   On April 7, 2022, Faraday announced that it received a letter from the Listing Qualification Department of the NASDAQ indicating that the Company was out of compliance with NASDAQ Listing Rule 5250(c)(1) for continued listing, resulting in delisting of the Company's securities.

320.   On this news, the Company's share price fell $0.05 per share, or more than 1%, to close at $4.19 per share on April 7, 2022.

### g.    April 14, 2022

321.   On April 14, 2022, Faraday announced that "additional investigative and remedial work in connection with the independent investigation has now been completed and on April 12, 2022, the Board approved certain additional remedial actions, effective immediately." In particular, the Company announced the following:

> Yueting (YT) Jia, the Company's founder, would no longer serve as an executive officer of the Company.

> Matthias Aydt, Senior Vice President, Business Development and Product Definition and a member of the Board, has been placed on probation as an executive officer for a six-month period effective immediately. During his period, he will remain as a non-independent member of the Board; and

> Certain other disciplinary actions and terminations of employment with respect to other Company employees (none of whom is an executive officer).

322.   The foregoing remedial actions were taken for multiple reasons including but not limited to such persons' (1) failure to fully disclose to the Company their relationships with certain related parties and affiliated entities in connection with the Company's July 2021 business combination with PSAC; (2) failure to fully disclose similar, potentially relevant information to individuals involved in the preparation of the Company's periodic SEC filings; and (3) lack of cooperation and withholding of potentially relevant information in connection with the Special Committee investigation.

323.   On this news, the Company's share price fell $0.12 per share, or more than 2%, to close at $4.50 per share on April 14, 2022.

### C.     False and Misleading Statements for the Securities Act Claims

324.    On April 5, 2021, PSAC filed its Registration Statement on Form S-4 with the SEC in connection with the merger.  The Registration Statement was signed by the Securities Act Defendants.  The Faraday Individual Defendants are responsible for the statements in the Registration Statement to the full extent permitted by law, due to their role as control persons of Faraday.  In the Registration Statement, the Company stated, in relevant part:

> FF expects to start commercial sales of FF 91 series within twelve months after closing of the Business Combination . . . .
>
> [. . .]
>
> FF plans to commence commercial sales of its first vehicle, FF 91 series, within twelve months after closing of the Business Combination . . . .
>
> [. . .]
>
> FF plans to continue to build-out its leased manufacturing facility in Hanford, California to commence production of FF 91 series within twelve months after closing of the Business Combination.
>
> [. . .]
>
> FF intends to commercially launch FF 91 series within twelve months after closing of the Business Combination.  Toward that goal, FF has completed most of the vehicle development milestones, including 29 prototype and 13 pre-production assets.
>
> [. . .]
>
> Unlike many competitors, FF has the advantage of speed to market as it is positioned to launch a production try-out in 9 months and commercial production of FF 91 series within 12 months after the Business Combination. FF has completed 29 prototypes and 13 pre-production assets and has completed most of the vehicle development hurdles including feasibility, concept and development phases.  As of the date hereof, 94% of the key components for FF 91 have been sourced, 91% production tooling is complete and 75% of production equipment is complete.
>
> [. . .]
>
> FF expects to derive revenue from FF 91, which is anticipated to launch twelve months after the closing of the Business Combination.

325.    The statements in ¶ 324 were materially false and misleading because:  (1) the FF 91 could not be produced within twelve months after closing of the merger; and (2) the statement omitted to disclose the present facts that the company faced hurdles in

development, manufacturing, and regulatory steps that made achieving production of the FF 91 and generating revenue from it within a year impossible.

326. The Registration Statement incorporated by reference the Company's January 28, 2021 press release titled "Faraday Future to List on NASDAQ Through Merger With Property Solutions Acquisition Corp. With Estimated $1 Billion in Proceeds" by stating, in relevant part, "Prior to market open January 28, 2021, PSAC and FF jointly issued a press release announcing the signing of the Merger Agreement, and PSAC filed a Current Report on Form 8-K announcing the execution of the Merger Agreement and discussing the key terms of the Merger Agreement in detail."  In the Company's January 28, 2021 press release, the Company stated, in relevant part:

> FF's flagship product offering will be the FF 91 . . . .  FF 91 is targeted to launch within twelve months after closing of the merger.
>
> [. . .]
>
> As the world's only tech-luxury intelligent Internet electric vehicle brand, FF expects to sell more than 400,000 units cumulatively over the next five years, and its first flagship model, the FF 91, has received over 14,000 reservations.

327.  The statements in ¶ 326 were materially false and misleading because:  (1) of the 14,000 reservations Faraday claimed to have received for the FF 91 vehicle, only several hundred were paid reservations for which the prospective customer had given a deposit, while the remaining were merely unpaid indications of interest; (2) 78% of the 14,000 reservations Faraday claimed to have received for the FF 91 vehicle were made by a single undisclosed company that is an affiliate of Faraday; (3) the FF 91 was not "targeted to launch" within twelve months after closing of the merger because wide-scale production within such a time frame was not achievable when the statement was made; and (4) the statement omitted to disclose the present facts that the company faced hurdles in development, manufacturing, and regulatory steps that made achieving production of the FF 91 and generating revenue from it within a year impossible.

328.  The Registration Statement was subsequently amended on June 1, 2021, June 21, 2021, and June 23, 2021, with each subsequent amendment containing the same

false and misleading statements found in ¶¶ 324, 326, including those incorporated by reference.

### D.    Undisclosed Adverse Facts

329.    The market for Faraday's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, Faraday's securities traded at artificially inflated prices during the Class Period.  Plaintiffs and other members of the Class purchased or otherwise acquired Faraday's securities relying upon the integrity of the market price of the Company's securities and market information relating to Faraday, and have been damaged thereby.

330.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Faraday's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Faraday's business, operations, and prospects as alleged herein.

331.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Faraday's financial well-being and prospects.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other

members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

### E.    Securities Act Counts

#### 1.    COUNT FIVE:  FOR VIOLATIONS OF SECTION 11 OF THE SECURITIES ACT OF 1933 (AGAINST ALL DEFENDANTS)

332.    Plaintiffs repeat and incorporate each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct.  Plaintiffs expressly disavow reliance on, or incorporation of, any allegation of fraud, recklessness or intentional misconduct for purposes of claims under the Securities Act.  Plaintiffs repeat, incorporate, and reallege each of the allegations set forth above as if set forth herein, except these Securities Act claims expressly do not make any allegations of fraud or scienter and do not incorporate any of the allegations in Section III.

333.    This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against all Defendants.

334.    The Registration Statement was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

335.    PSAC is the registrant for the Offering.  The PSAC Defendants named herein were responsible for the contents and dissemination of the Registration Statement.

336.    As issuer of the shares, Defendants are strictly liable to Plaintiffs and the Class for the misstatements and omissions.

337.    None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

338.    By reasons of the conduct herein alleged, each of the Defendants violated, and/or controlled a person who violated Section 11 of the Securities Act.

AMENDED CLASS ACTION COMPLAINT: CASE NO. 2:21-CV-09914-CAS-JC

339. Plaintiffs and the Class acquired Faraday securities pursuant and/or traceable to the Registration Statement.

340. Plaintiffs and the Class have sustained damages. The value of Faraday securities has declined substantially subsequent to and due to the Defendants' violations.

### 2. COUNT SIX: FOR VIOLATIONS OF SECTION 15 OF THE SECURITIES ACT OF 1933 (AGAINST THE FARADAY INDIVIDUAL DEFENDANTS, THE SECURITIES ACT DEFENDANTS, AND THE PSAC DEFENDANTS)

341. Plaintiffs repeat and incorporate each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct. Plaintiffs expressly disavow reliance on, or incorporation of, any allegation of fraud, recklessness or intentional misconduct for purposes of claims under the Securities Act. Plaintiffs repeat, incorporate, and reallege each of the allegations set forth above as if set forth herein, except these Securities Act claims expressly do not make any allegations of fraud or scienter and do not incorporate any of the allegations in Section III.

342. This count is asserted against the Faraday Individual Defendants, the Securities Act Defendants, and the PSAC Defendants and is based upon Section 15 of the Securities Act.

343. The Faraday Individual Defendants, the Securities Act Defendants, and the PSAC Defendants, by virtue of their offices, directorship, and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Faraday and PSAC within the meaning of Section 15 of the Securities Act. The Faraday Individual Defendants, the Securities Act Defendants, and the PSAC Defendants had the power and influence and exercised the same to cause Faraday to engage in the acts described herein.

344. The Faraday Individual Defendants, the Securities Act Defendants, and the PSAC Defendants were each culpable participants in the violation of Section 11 of the Securities Act alleged in Count Five above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process that allowed the Business Combination to be successfully completed.

345. By virtue of the conduct alleged herein, the Faraday Individual Defendants, the Securities Act Defendants, and the PSAC Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiffs and the Class for damages suffered

## V.    PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiffs as the Class Representatives;

B.    Awarding compensatory damages in favor of Lead Plaintiff and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in investigating, bringing, and maintaining this action, including counsel fees and expert fees; and

D.    Awarding such other and further legal or equitable relief as the Court deems just and proper.

## VI.    JURY TRIAL DEMANDED

Lead Plaintiff hereby demands a trial by jury on all issues so triable in this Action.

Dated:  May 6, 2022

Respectfully submitted,

POMERANTZ LLP

*/s/ Austin Van*
Jeremy A. Lieberman (*pro hac vice*)
Austin P. Van (*pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
jalieberman@pomlaw.com
avan@pomlaw.com

Jennifer Pafiti
1100 Glendon Avenue, 15th Floor
Los Angeles, California  90024
Telephone:  (310) 405-7190
Facsimile:  (917) 463-1044
jpafiti@pomlaw.com

*Co-Lead Counsel for Lead Plaintiffs*

WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP
Matthew M. Guiney (pro hac vice)
Patrick Donovan (pro hac vice)
Rourke C. Donahue (pro hac vice)
270 Madison Avenue
New York, New York 10016
Telephone: (212) 545-4600
Facsimile: (212) 686-0114
guiney@whafh.com
donovan@whafh.com
donahue@whafh.com

AMENDED CLASS ACTION COMPLAINT: CASE NO. 2:21-CV-09914-CAS-JC

*Co-Lead Counsel for Lead Plaintiffs*

Junbo Hao
HAO LAW FIRM
BEIJING HAO JUNBO LAW FIRM
Room 3-401 No. 2 Building,
No. 1 Shuangliubei Street
100024  Beijing
People's Republic of China
Telephone: +86 137-1805-2888
Email:  jhao@haolaw.cn

Laurence M. Rosen
THE ROSEN LAW FIRM, P.A.
One Gateway Center, Suite 2600
Newark, New Jersey 07102
Telephone:  (973) 313-1887
Facsimile:  (973) 833-0399
Email:  lrosen@rosenlegal.com

*Additional Counsel for Lead Plaintiffs*

**CERTIFICATE OF SERVICE**

I, Austin P. Van, hereby certify that a true and correct duplicate copy of the foregoing Amended Class Action Complaint for Violations of the Federal Securities Laws was filed electronically on May 6, 2022.  Parties may access this filing through the Court's CM/ECF system.

*/s/ Austin Van*